# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Uniontown Newspapers, Inc., d/b/a The Herald Standard; and Christine Haines, | : : : : | |
| Petitioners | : : | No. 66 M.D. 2015 |
| v. | : : | Heard: August 28, 2017 |
| Pennsylvania Department of Corrections, | : : : | |
| Respondent | : | |

BEFORE:   HONORABLE ROBERT SIMPSON, Judge

**OPINION**
**BY JUDGE SIMPSON**                    **FILED: March 23, 2018**

Before me, in the fact-finding stage, is the enforcement action filed by Uniontown Newspapers, Inc., d/b/a *The Herald Standard*, through reporter Christine Haines (Requester) seeking sanctions for the Department of Corrections' (DOC) violations of the Right-to-Know Law (RTKL).[1]  On cross-motions for summary relief, this Court held DOC did not fully comply with the Office of Open Records' (OOR) final determination that ordered disclosure of all records responsive to Requester's RTKL request (Disclosure Order).  Uniontown Newspapers, Inc. v. Dep't of Corr., 151 A.3d 1196 (Pa. Cmwlth. 2016) (Summary Relief Opinion).  Because we could not discern the extent of DOC's noncompliance, and whether it amounted to bad faith warranting sanctions, the parties developed the record.  Based on the parties' submissions, and after a hearing, I find some of DOC's noncompliance constitutes bad faith that merits statutory sanctions.

---

[1] Act of February 14, 2008, P.L. 6, 65 P.S. §§67.101–67.3104.

## I. Background

### A. Overview

On September 25, 2014, Requester sent an email seeking diagnosis data of inmates at State Correctional Institution (SCI)-Fayette, based in part on its proximity to a fly ash dump in Fayette County (Request).[2] Jt. Ex. 3. It also sought information comparing illnesses of SCI-Fayette inmates with inmates at other SCIs.

Weeks before DOC received the Request, the Abolitionist Law Center published a report, "No Escape: Exposure to Toxic Coal Waste at [SCI-] Fayette," correlating ill health of SCI-Fayette inmates to toxic coal waste (No Escape Report). See Jt. Ex. 2. In response, DOC coordinated with the Department of Health (DOH) to investigate the claims in the No Escape Report (No Escape Investigation). Then-Director of DOC's Bureau of Health Care Services, Christopher Oppman (Oppman), oversaw the No Escape Investigation, which was led by Dr. Paul Noel and Dr. Eugene Ginchereau.

During the No Escape Investigation, DOC and DOH consulted multiple sources of illness information. The sources included: causes of inmate deaths (Mortality Lists); a database that tracked inmates treated for cancer (Oncology Database); reports of inmate medications prepared by DOC's pharmacy contractor (Pharmacy Contractor Reports); and, records showing inmates enrolled in Chronic Care Clinics, tracked via the PTrax database (collectively, Inmate Illness Sources).

DOC received the Request after the No Escape Investigation was underway. DOC assumed the Request related to the No Escape Investigation.

---

[2] The Request expressly did "not see[k] identifying information," like names. Jt. Ex. 3.

2

After invoking a 30-day extension, DOC denied the Request in its entirety, citing seven exceptions under Section 708(b) of the RTKL, 65 P.S. §67.708(b), as well as the attorney-client privilege and deliberative process privilege. DOC Open Records Officer Andrew Filkosky (Filkosky) issued the denial.

Requester appealed to OOR. During the appeal, DOC asserted only Section 708(b)(17), 65 P.S. §67.708(b)(17) (relating to noncriminal investigations). In support, DOC submitted Oppman's declaration under penalty of perjury that "the records requested … are presently part of a noncriminal investigation that was started by [DOC] and now includes [DOH]." Jt. Ex. 6 (2014 Oppman Verification at ¶4). Oppman also attested: "[DOC] has generated the records [Requester] requests." Id. at ¶6. Chase DeFelice (DeFelice), in-house counsel for DOC, handled the appeal.

OOR was unpersuaded that the records requested were investigative. Thus, OOR ordered DOC to disclose "all responsive records" within 30 days. Jt. Ex. 8 (OOR Final Determination, dated December 1, 2014). DOC did not appeal.

On December 31, 2014, DeFelice timely disclosed 15 pages of records to Requester (2014 Disclosure). Jt. Ex. 12. The 2014 Disclosure consisted of charts depicting the following: the number of patients with pulmonary conditions in all SCIs (from Chronic Care Clinic records); the number of inmates with cancer in all SCIs (2010-13); inmate cancer deaths by institution (2010-13); inmate cancer deaths at SCI-Fayette (2003-13); the number of inmates treated by Pharmacy Contractor for pulmonary ailments (2010-14); and, the number of inmates treated by Pharmacy Contractor for gastrointestinal ailments (2010-14). Id.

3

In January 2015, Requester asked DOC to verify the completeness of the 2014 Disclosure. DeFelice advised additional review was needed first "to see if other records existed that were responsive." DOC's New Matter at ¶80. After undertaking additional review, DOC disclosed a memo from Dr. Ginchereau to Dr. Noel and an email from Dr. Noel about the No Escape Investigation. Jt. Ex. 21 at H & I.

The next day, DOC disclosed cancer patient tracking charts from the Oncology Database for DOC as of November 2014, and for SCI-Fayette as of January 2015. Id. at K & L (collectively with the records described immediately above, 2015 Disclosure). At that time, Oppman verified that DOC had no other records of SCI-Fayette inmate illnesses "by type and quantity[,] and comparison of illness rates at other [SCIs]." Id. at M (2015 Oppman Verification).

In February 2015, within six weeks of the 2014 Disclosure, Requester filed the instant petition for enforcement, seeking statutory sanctions for bad faith (Petition). To obtain all responsive records, and to assess DOC's alleged bad faith, Requester enlisted this Court's fact-finding function under Chapter 13 of the RTKL.

DOC filed preliminary objections to the Petition. After this Court overruled the preliminary objections, DOC filed an answer and new matter. Requester then filed a motion for judgment on the pleadings, which this Court denied.

Requester deposed Oppman and Dr. Noel in April 2016 to determine how DOC maintained potentially responsive records, and what records remained outstanding. Thereafter, the parties submitted cross-motions for summary relief.

In December 2016, this Court issued the Summary Relief Opinion. The Summary Relief Opinion identified five types of records as responsive to the Disclosure Order: No Escape Investigation-related records (created by investigators such as Dr. Noel), plus the four Inmate Illness Sources consulted during the No Escape Investigation (Mortality Lists, Pharmacy Contractor Reports, Oncology Database, and Chronic Care Clinic records, via PTrax). The Summary Relief Opinion also directed the parties to file a stipulation as to the disclosure status of these five types of records.

In 2017, the parties engaged in discovery. In March 2017, in response to discovery requests, DOC disclosed all Mortality Lists and additional data from the Oncology Database (2017 Disclosure). See Jt. Ex. 21 at Q & P. The parties then filed a stipulation (Stipulation) reflecting that Pharmacy Contractor Reports and Chronic Care Clinic records remained outstanding. See Jt. Ex. 21 at A-Q.

In August 2017, I held a hearing, where I admitted the parties' joint exhibits. During the hearing, Requester presented the testimony of Michael Palm, Executive Editor of *The Herald Standard*, regarding the genesis of the Request. As to DOC's conduct, the parties also presented the testimony of Oppman and DeFelice. Oppman testified about his role in the No Escape Investigation, and his role in responding to the Request. DeFelice testified about his role in gleaning responsive records during litigation, and DOC's attempted compliance with the Disclosure Order. Additionally, DOC presented the testimony of Filkosky, who testified about his role as Open Records Officer handling the Request during the request stage.

In October 2017, the parties submitted proposed findings of fact and conclusions of law. The matter is now ready for disposition.

## B. Findings

I credit the testimony of the witnesses based on their demeanor and their responsiveness. To the extent their testimony is inconsistent, I consider Oppman's testimony most persuasive based on the quality of his recollection and his directness. Oppman also had the most familiarity with the records requested. In weighing his trial testimony, I also considered his deposition testimony and his two verifications. Based on the credited evidence and admissions, I make the following narrative findings.

## 1. No Escape Investigation

The purpose of the No Escape Investigation was to evaluate the No Escape Report's allegations about SCI-Fayette inmates' ill health, which focused on cancer, pulmonary, and gastrointestinal diseases. During the No Escape Investigation, Oppman served as the liaison to DOH. He also conferred with physicians like Dr. Noel, who made clinical findings based on their review of inmate medical files and the four Inmate Illness Sources.

Of the Inmate Illness Sources, DOC had direct access to Mortality Lists, the Oncology Database, and Chronic Care Clinic records, but not to medication data maintained by Pharmacy Contractor. As part of the No Escape Investigation, DOC asked Pharmacy Contractor to prepare reports of inmate medications corresponding to pulmonary and gastrointestinal ailments. DOC did not request reports relating to other illnesses.

6

In reviewing Chronic Care Clinic records, investigators consulted the online database, PTrax, which tracked inmate treatment in each of DOC's 13 clinics.[3] Of significance, PTrax is a "live" database that changes daily. Notes of Testimony (N.T.), 8/28/17, at 58. At a minimum, PTrax shows the number of inmates enrolled in a specific clinic at a specific time. However, a clinic may encompass multiple diagnoses, e.g., the pulmonary clinic treats conditions ranging from asthma to lung disease. Id. at 33. The No Escape Investigation focused on the pulmonary clinic.

Based on the Inmate Illness Sources and DOC's clinical review of inmate medical files, DOH reported its findings. Jt. Ex. 21 at N (DOH Report, 12/29/14). Because it was created subsequent to the Request, the DOH Report was not a responsive record subject to OOR's Disclosure Order. Nonetheless, DOC sent the DOH Report to Requester after it initiated enforcement proceedings.

## 2. Request & RTKL Process

The Request sought data of inmates' diagnoses, by type of illness and the number of inmates afflicted, at SCI-Fayette and other SCIs. The Request was not limited to certain illnesses; however, Requester noted a "particular interes[t]" in cancer or respiratory ailments. Jt. Ex. 3. Relevant here, the Request did not reference either the No Escape Report or the No Escape Investigation. Nevertheless, "[DOC] assumed … [Requester] w[as] looking for" the results of the No Escape Investigation. N.T. at 50. Other than timing, DOC had no reason to believe the Request related to the No Escape Investigation.

---

[3] DOC's chronic care clinics correspond to the following chronic conditions: HIV/AIDS; cardiovascular; tuberculosis; endocrine; dialysis; diabetes; hypertension; pulmonary; seizure; infectious disease; neurology; psychiatry; and, nephrology. Jt. Ex. 21, Stip. at III(A)(2).

## a. Request Stage

Generally, when DOC receives a RTKL request, the open records officer or legal liaison sends an internal email identifying custodians of potentially responsive records, including appropriate instructions for responding. Jt. Ex. 19 (Policy). When a record custodian receives the request, "**there must be no disposal of potentially responsive records** (no deletion of partially responsive e-mails, etc.), … notice of the RTKL request should be considered the equivalent of a litigation hold." Jt. Ex. 1 (RTKL Procedures,[4] 2/2/12) (bold in original); see N.T. at 78.

Record custodians are required to deliver responsive records to an open records officer "as soon as possible to allow adequate time for review and redaction and for the legal bases for redactions and other denials to be incorporated into the final response letter." Jt. Ex. 19, Policy, Part IV(E). The open records officer must retain all potentially responsive records obtained from the custodian "until further notice" regardless of a record retention schedule permitting disposal. Id. at Part IV(K)(19).

At all relevant times, Filkosky served as DOC's Open Records Officer, and Maria Macus Bryan, Esquire, served as legal liaison.

Here, Filkosky read the Request. After identifying DOC's Bureau of Health Care Services (Health Care Bureau) as the custodian of potentially responsive

---

[4] Filkosky testified he was governed by the Policy (Jt. Ex. 19); however, he disclaimed any knowledge of the RTKL Procedures (Jt. Ex. 1). Notes of Testimony (N.T.), 8/28/17, at 129. DOC's legal liaison produced the RTKL Procedures in discovery when asked for a copy of DOC's "process" for responding to RTKL requests. Id. Thus, I infer that the RTKL Procedures govern the legal liaison and record custodians, whereas the Policy governs the open records officer.

records, Filkosky merely forwarded the Request by email, without any instructions. The Health Care Bureau did not respond in writing. Rather, one of its representatives, Cathy Montag,[5] advised Filkosky in person that DOC and DOH were involved in the No Escape Investigation and that all responsive records related to the No Escape Investigation. Based solely on her representation, Filkosky concluded that all responsive records would be related to the No Escape "[I]nvestigation, other than inmates' medical files." N.T. at 128.

Significantly, Filkosky did not receive any potentially responsive records from DOC's Health Care Bureau. N.T. at 128. Without understanding the records involved, he relied on DOC's Health Care Bureau's assessment that any responsive records related to the No Escape Investigation. Filkosky also did not discern what records were allegedly investigative either to document their content or to assess any exemptions. N.T. at 135. Filkosky issued DOC's denial under Section 903 of the RTKL without reviewing any records. N.T. at 128.

Accordingly, DOC did not perform its duties during the request stage in several material respects. In short, DOC neglected to: perform a good faith search; obtain records from sources consulted during the No Escape Investigation; review all potentially responsive records; and, assess the content of responsive records before withholding access.

---

[5] Oppman testified about his interactions with DeFelice, who became involved during the appeal stage. N.T. at 46. Oppman did not mention Filkosky. Filkosky interacted with Cathy Montag from the Bureau of Health Care Services that Oppman directed at the time. N.T. at 127. Filkosky did not mention Oppman. I infer from the testimony that Oppman was not directly involved in responding to the Request during the request stage.

9

## b. Appeal Stage

DeFelice handled the appeal before OOR. DeFelice gave Oppman the Request, asking him to pull information from the No Escape Investigation. N.T. at 46. Based on his familiarity with inmate health records, Oppman was the person "in the best position to respond to [the Request]." Id. at 41.

Before the Request, Oppman responded to few RTKL requests; he received no RTKL training. N.T. at 29. Oppman confirmed that no one at DOC's Health Care Bureau searched for records in response to the Request. Id. at 50. Instead, DOC presumed the Request related to the No Escape Investigation. Id. Notably, however, Oppman did not believe Requester was aware of the No Escape Investigation. Id. at 42.

During the appeal stage, DeFelice did not discern what information was consulted during the No Escape Investigation to assess its investigative content. Id. at 93-94. DeFelice was also unfamiliar with how the Health Care Bureau maintained responsive records when he prepared a verification for Oppman's signature (2014 Oppman Verification) to establish all responsive records related to the No Escape Investigation.

The 2014 Oppman Verification was the only evidence DOC submitted to OOR during the appeal stage, and it pertained only to the noncriminal investigation exception. Therein, Oppman attested that DOC generated records as part of the No Escape Investigation. Jt. Ex. 6. However, Oppman clarified during the hearing that the term "generated," in context, also referred to the four types of

10

records *consulted* during the No Escape Investigation (Inmate Illness Sources), which existed independently. N.T. at 44. The Inmate Illness Sources were not themselves investigative in nature.

Ultimately, OOR deemed the 2014 Oppman Verification insufficient, and it determined "all responsive records" to the Request were public. Jt. Ex. 8 (Final Determination at 9). As a result, information contained in the Inmate Illness Sources, and records DOC generated during the No Escape Investigation that included inmate illness data, were subject to mandatory disclosure within 30 days. Id.

**c. Post-Appeal**

In the 2014 Disclosure, DOC timely disclosed five charts consisting of some information contained in the Inmate Illness Sources. However, although the Request was not limited to specific diseases, the 2014 Disclosure was limited to two illness types (cancer and pulmonary conditions), except that the Pharmacy Contractor Reports also included gastrointestinal ailments. Further, the 2014 Disclosure did not include information contained in the Oncology Database, which showed the number of inmates treated for cancer. N.T. at 94.

Requester challenged the completeness of the 2014 Disclosure, and it asked DeFelice to confirm that no other responsive records existed. In particular, Requester emphasized the press release regarding the No Escape Investigation results revealed DOC's Health Care Bureau "maintain[ed] an extensive database of all current cancer patients in [SCIs]." Jt. Ex. 13. However, DOC did not disclose any data from the Oncology Database to Requester. N.T. at 94 (DOC "admitted that [the

11

Oncology Database] was not provided on December 31ˢᵗ … because [DeFelice] didn't have it.").

A week after the deadline for compliance with the Disclosure Order passed, DeFelice was uncertain whether DOC performed a thorough search for all responsive records. See DOC's New Matter at ¶80. Only then did DeFelice search Dr. Noel's files. At that time, he discovered records showing data from the Oncology Database. N.T. at 94. He also discovered the memo from Dr. Ginchereau and an email from Dr. Noel, which were also responsive to the Request. These three records were disclosed to Requester in January 2015, and comprised the 2015 Disclosure.

After this additional search, DOC confirmed there were no additional responsive records in the 2015 Oppman Verification. However, this verification was inaccurate in that it did not account for responsive records related to *all* illnesses. Because DOC only disclosed records related to cancer and pulmonary disease, the 2015 Disclosure was incomplete.

### d. Enforcement Stage

Believing more responsive records existed, Requester filed its Petition. As further explained in the Summary Relief Opinion, "all responsive records" includes the four Inmate Illness Sources that pre-existed the No Escape Investigation. The Inmate Illness Sources are not limited to cancer, pulmonary, and gastrointestinal ailments. The Request, both on its face and as construed by OOR, was not so limited. Therefore, DOC did not comply with the Disclosure Order.

12

Prior to the enforcement stage, DOC recognized that Mortality Lists, the Oncology Database, Chronic Care Clinic records, and Pharmacy Contractor Reports were responsive to the Request. When this Court confirmed in the Summary Relief Opinion that such records were responsive without limitation on illness type, DOC still withheld responsive records.

DOC did not disclose the entire Oncology Database until the parties engaged in discovery in March 2017. It also withheld all Mortality Lists until it provided the 2017 Disclosure. DOC did not explain this delay.

As of June 2017, DOC did not determine whether Pharmacy Contractor could generate inmate medication reports corresponding to diseases other than pulmonary and gastrointestinal. DOC did not ask Pharmacy Contractor for such inmate medication reports.

Also, DOC did not obtain or disclose Chronic Care Clinic records, through PTrax or otherwise, that corresponded to diseases other than pulmonary. There are 12 other clinics, the data from which would show the number of inmates treated for certain conditions at a given time. N.T. at 34.

To date, DOC did not disclose "all responsive records."

## II. Bad Faith under the RTKL

The core purpose of the RTKL is ensuring access to agency records. The RTKL "is remedial legislation designed to promote access to official government information in order to prohibit secrets, scrutinize the actions of public

13

officials, and make public officials accountable for their actions ….” Bowling v. Office of Open Records, 990 A.2d 813, 824 (Pa. Cmwlth. 2010) (en banc), aff’d, 75 A.3d 453 (Pa. 2013); Office of Dist. Att’y of Phila. v. Bagwell (Phila. DA), 155 A.3d 1119, 1130 (Pa. Cmwlth. 2017) (“the RTKL is remedial in nature … ”).

In the RTKL context, “bad faith” does not require a showing of fraud or corruption. The lack of good faith compliance with the RTKL and an abnegation of mandatory duties under its provisions rise to the level of bad faith. Phila. DA (affirming trial court’s award of $500 civil penalty for bad faith); Chambersburg Area Sch. Dist. v. Dorsey, 97 A.3d 1281 (Pa. Cmwlth. 2014) (agency failure to review responsive records was grounds from which fact-finder could discern bad faith); Staub v. City of Wilkes-Barre & LAG Towing, Inc. (Pa. Cmwlth., No. 2140 C.D. 2012, filed October 3, 2013), 2013 WL 5520705 (unreported) (affirming attorney fee award for agency failure to confer with contractor before responding to request). The RTKL reserves bad faith determinations for disposition by Chapter 13 Courts. Bowling v. Office of Open Records, 75 A.3d 453 (Pa. 2013).

The RTKL requires an agency to make a good faith effort to find and obtain responsive records before denying access. Dorsey. “[A]n agency [may not] avoid disclosing existing public records by claiming, in the absence of a detailed search, that it does not know where the documents are.” Pa. State Police v. McGill, 83 A.3d 476, 481 (Pa. Cmwlth. 2014) (emphasis added). Where an agency did not perform a search of its records under the RTKL until the matter was in litigation, the agency denied access in willful disregard of the public’s right to public records. Parsons v. Pa. Higher Educ. Assist. Agency (PHEAA), 910 A.2d 177 (Pa. Cmwlth.)

14

(en banc), appeal denied, 917 A.2d 316 (Pa. 2006) (agency failure to review records before a hearing on denial showed willful violation of former Right-to-Know Law).[6]

A requester bears the burden of proving an agency committed bad faith. Uniontown Newspapers. Evidence of bad faith is required. Barkeyville Borough v. Stearns, 35 A.3d 91 (Pa. Cmwlth. 2012). After-discovered records are a type of evidence from which a court may discern bad faith. Dorsey. Evidence of an agency's failure to perform its mandatory duties, including a failure to search its records prior to a denial of access, may suffice. Dorsey; accord PHEAA.

## A. Bad Faith Allegations

Requester claims three grounds for DOC's bad faith under the RTKL: (1) narrow construction of the Request; (2) failure to search records in good faith as required by the RTKL; and, (3) noncompliance with OOR's Disclosure Order.

## 1. Construction of the Request

As the Request did not mention the No Escape Investigation or the No Escape Report, DOC had no apparent basis, other than coincidental timing, for assuming the Request sought only records related to the No Escape Investigation. N.T. at 42. However, Requester did not show that DOC's error in construction rose to the level of bad faith.

---

[6] Act of June 21, 1957, P.L. 390, as amended, 65 P.S. §§66.1-66.9, repealed by, Section 3102(2)(ii) of the RTKL, 65 P.S. §67.3102(2)(ii).

Requester submitted no evidence that it communicated with DOC during the request or appeal stages about the parameters of the Request.[7] Filkosky, who forwarded the Request to DOC's Health Care Bureau, "didn't interpret the [R]equest." N.T. at 141. He accepted the Health Care Bureau's assertions that the Request related to the No Escape Investigation without question.

Nevertheless, in these circumstances, the evidence manifests no attempt to construe the Request in any particular manner. Thus, the construction of the Request alone does not evince bad faith. The primary problem revealed during the hearing was that DOC did not give any specific, *separate* consideration to the Request at all.

## 2. Noncompliance with RTKL

### a. Request Stage - Good Faith Search

Chapter 9 of the RTKL sets forth an agency's mandatory duties during the request stage. 65 P.S. §§67.901-.905. Section 901 of the RTKL

> mandate[s] that '[u]pon **receipt** of a written request for access to a record, an agency shall make a *good faith* effort to determine if the record requested is a public record, legislative record or financial record and whether the agency has possession, custody or control of the identified record, and to respond as promptly as possible under the circumstances existing at the time of the request.' 65 P.S. §67.901.

Phila. DA, 155 A.3d at 1130 (italics in original; bold and underline added).

---

[7] Moreover, while agencies are encouraged to contact requesters to assess the parameters of a RTKL request during the request stage, and to resolve access disputes without litigation, such communications must be documented to ensure there is a consistent record for subsequent reviewers in case the attempt to avoid litigation is unsuccessful.

Upon receipt of a request, an open records officer "must make a good faith effort to determine whether: (1) the record is a public record; and, (2) the record is in the possession, custody, or control of the agency." Breslin v. Dickinson Twp., 68 A.3d 49, 54 (Pa. Cmwlth. 2013) (citing Barkeyville Borough, 35 A.3d at 96). Section 901 also includes the duty to perform a reasonable search for records in good faith. Dep't of Labor & Indus. v. Earley, 126 A.3d 355 (Pa. Cmwlth. 2015). As part of a good faith search, the open records officer has a duty to advise all custodians of potentially responsive records about the request, and to obtain all potentially responsive records from those in possession. Breslin.

When records are not in an agency's physical possession, an open records officer has a duty to contact agents within its control, including third-party contractors. Breslin; Staub. Under Section 506(d) of the RTKL, 65 P.S. §67.506(d), "the agency is required to take reasonable steps to secure the records from the [contractor] and then make a determination if those records are exempt from disclosure." Staub, slip op. at 6, 2013 WL 5520705 at *2.

After obtaining all potentially responsive records, an agency has the duty to review the records and assess their public nature under Sections 901 and 903 of the RTKL. Breslin; PHEAA. It is axiomatic that an agency cannot discern whether a record is public or exempt without first obtaining and reviewing the record.

Here, DOC did not make a good faith effort to determine whether it had possession or control of responsive records upon receipt of the Request. Critically, it did not perform any search for records in response to the Request. N.T. at 48, 83.

17

DOC's failure to search records in its possession for responsive records during the request stage constitutes bad faith. Dorsey (remand to trial court to assess bad faith when agency discovered 3,500+ pages of records after the appeal stage). Like the agency in Dorsey, DOC did not learn about responsive records until well into the litigation. An agency's failure to locate responsive records until motivated by litigation evinces bad faith, meriting consideration by a fact-finder. Id.

Presuming DOC believed that the Request sought only records related to the No Escape Investigation, DOC breached its duty to obtain all potentially responsive records from its Health Care Bureau and all other records custodians upon receipt of the Request. Like the agency in Staub, DOC did not contact Pharmacy Contractor to obtain potentially responsive records during the request stage.

Here, DOC did not attempt to discern what records purportedly related to the No Escape Investigation until the appeal stage. DOC did not document the sources of potentially responsive records, such as the four Inmate Illness Sources. As a result, DOC was unaware what records its Health Care Bureau deemed responsive, and yet investigative. Without obtaining or reviewing any records, DOC denied access to responsive public records. DOC's failure to comply with Section 901 prior to issuing its "denial" under Section 903 constitutes bad faith. PHEAA.

DOC also did not preserve all potentially responsive records during the request stage. N.T. at 130-36. During the hearing, DOC admitted that information in

18

the Inmate Illness Sources was responsive to the Request. N.T. at 44-45. Other than data corresponding to the pulmonary clinic, id. at 35, DOC did not preserve any PTrax records showing the number of inmates admitted in each clinic as of the date of the Request.

However, I do not find that DOC's failure to "freeze" or hold the live-updating PTrax database for the Chronic Care Clinics amounted to bad faith. Primarily, I view DOC's RTKL Procedures as precluding knowing disposal of potentially responsive records, such as deleting emails or subjecting records to a predictable, periodic purge consistent with an agency-wide records retention policy. Here, I am not persuaded that there was a knowing decision regarding the PTrax database, which may change daily. Moreover, I am not persuaded that it is appropriate to expect an instantaneous litigation hold on specialized records of this type. Rather, an agency must be afforded a reasonable amount of time to set in place a litigation hold; a few hours is not a reasonable amount of time under these circumstances.

**b. Appeal Stage - OOR**

Before OOR, DOC represented that it possessed responsive records, but that those records "related to the [No Escape] Investigation." Jt. Ex. 6 (2014 Oppman Verification). Although he prepared the 2014 Verification for Oppman's signature, DeFelice did not understand what documents purportedly related to the No Escape Investigation. The 2014 Oppman Verification did not describe the records to which it pertained. Further, there is no evidence that DOC reviewed potentially responsive records before litigating their investigative nature before OOR.

19

DOC's submissions to OOR representing that records were exempt, without reviewing the records, is not sustainable. At a minimum, during the appeal stage, DOC should have assessed what potentially responsive records were kept where, and reviewed those records before submitting verifications to OOR attesting to their content or completeness. By contesting access during the appeal, without obtaining all records and assessing the records' public nature, DOC acted in bad faith.

### 3. Noncompliance with Disclosure Order

As to noncompliance with OOR's Disclosure Order, DOC bore the burden to prove it provided "all responsive records." Accord Earley (agency must show it reasonably searched records to establish nonexistence of responsive records). DOC did not meet this burden.

DOC was delinquent in waiting until *after* the date for compliance with the Disclosure Order passed to confirm whether it performed a comprehensive search for all potentially responsive records. DOC's New Matter at ¶80. At that point, it discovered additional records in the Oncology Database. Thus, even when misconstruing the Request as limited to cancer and pulmonary disease, DOC still did not compile all responsive records within 30 days of the Disclosure Order.

As explained above, all of the data of inmate illnesses contained in the four Inmate Illness Sources were responsive to the Request. This Court's Summary Relief Opinion confirmed that the data subject to disclosure under the Disclosure Order were not limited by type of illness (cancer, pulmonary or gastrointestinal ailments). Also, this Court noted any records "DOC created … prior to the Request

20

date from its review of inmate medical files when conducting the [No Escape] Investigation … are responsive," as well as emails. Summ. Relief Op. at 16, n.7 & 8; 151 A.3d at 1207, n.7 & 8. Yet, DOC did not compile "all responsive records" as this Court explained the phrase in 2016.

Notwithstanding our Summary Relief Opinion, DOC did not disclose all Mortality Lists and the Oncology Database until months later. Jt. Ex. 21, Stip. at II(4). Indeed, as of March 2017, DOC had not determined the accessibility of inmate medication records from Pharmacy Contractor for conditions other than pulmonary and gastrointestinal diseases. It did not assess Pharmacy Contractor's reporting capabilities until June 2017. See Jt. Ex. 18 (Affidavit).

Almost three years after receiving the Request, DOC contacted Pharmacy Contractor to obtain potentially responsive records. DOC then learned that Pharmacy Contractor prepared the Reports at its request, extrapolating from raw dispensing data and synthesizing the data into a useful format for comparison. Id. Records from Pharmacy Contractor showing inmate medications for other than pulmonary and gastrointestinal ailments, in whatever form such information exists, remain outstanding.

In sum, DOC violated the Disclosure Order when it did not disclose "all responsive records" within 30 days. DOC's violation evinced a lack of good faith when DOC did not discern the sources of or review all potentially responsive records

before the compliance deadline.[8]  Also, because of DOC's failure to preserve all potentially responsive records, certain Chronic Care Clinic records are no longer available.  Due to the nature of PTrax, this cannot be cured by late disclosure.

Enforcement proceedings should not be necessary to ensure an agency's compliance with its statutory duties.  DOC's delay in complying with the Disclosure Order was unreasonable.  Once this Court issued the Summary Relief Opinion, there was no excuse for further delay.  Yet, DOC forced Requester to expend time and resources to discern what responsive records remained undisclosed.  Under these circumstances, DOC's persistent denial of access constitutes bad faith.

**B. Relief**

**1. Undisclosed Responsive Records**

To avoid further confusion, DOC is ordered to disclose "all responsive records" to Requester within 20 days.[9]  "All responsive records" include the Inmate Illness Sources consulted in the No Escape Investigation, but without limitation as to illness type, as well as No Escape Investigation-related records investigators (such as Dr. Noel) created before DOC received the Request.

DOC has not verified the completeness of its disclosures to date to conform to the evidence and findings by this Court.  As part of its compliance obligations, DOC is ordered to do so.

_____

[8] This was after the 30-day appeal period in Section 1301(a) of the RTKL, 65 P.S. §67.1301(a), expired.  As a result, Requester could not appeal the alleged incompleteness of DOC's 2014 Disclosure.

[9] This 20-day timeframe does not apply to records of Pharmacy Contractor as further explained below.

As to Pharmacy Contractor Reports, DOC has the duty to obtain information corresponding to inmate medications in the form in which Pharmacy Contractor maintains it. Staub. Pulling information from a database is not creating a record. Dep't of Envtl. Prot. v. Cole, 52 A.3d 541 (Pa. Cmwlth. 2012).

However, DOC is not required to compile the information Pharmacy Contractor provides in any specific format, including the format Pharmacy Contractor specially-created as to pulmonary and gastrointestinal diseases, already timely disclosed to Requester. Such formatting would amount to creation of a record under Section 705 of the RTKL, 65 P.S. §67.705.

Pharmacy Contractor attested it provides innumerable reports for DOC. Jt. Ex. 18 at ¶10. Although none state specific diagnoses, reports that "document the number of patients being treated with a particular Therapeutic class of drug" are within the scope of the Request. Id. at ¶11. Accordingly, DOC shall obtain and disclose records of inmate medications within 30 days, accompanied by a detailed affidavit explaining its attempt to obtain these records from Pharmacy Contractor.

As to PTrax, I find that information in PTrax as it existed on the day of the Request is no longer recoverable. See N.T. 58; see also Jt. Ex. 21, Stip. III(A). To ensure the most complete information is made available, DOC shall describe the type of Chronic Care Clinic records reviewed during the No Escape Investigation, and confirm whether information showing the number of inmates with chronic illnesses, other than pulmonary, remains available. DOC shall disclose such records, accompanied by an affidavit verifying their completeness, within 20 days.

## 2. Sanctions

In its Petition, Requester sought civil penalties under Section 1305(a) of the RTKL, 65 P.S. §67.1305(a).[10]  Section 1305(a) provides:  "A court may impose a civil penalty of not more than $1,500 if an <u>agency denied access</u> to a public record <u>in bad faith</u>."  <u>Id.</u> (emphasis added).

"[T]he purpose of Section 1305 of the RTKL is … to penalize conduct of [an] agency and to provide a deterrent in the form of a monetary penalty in order to prevent acts taken in bad faith in the future."  <u>Phila. DA</u>, 155 A.3d at 1141 (affirming $500 penalty).  "Section 1305 of the RTKL is directed wholly to the agency charged with a mandatory duty under the RTKL to provide requesters access to public records within the agency's custody and control."  <u>Id.</u> at 1140.

The RTKL vests Chapter 13 Courts with jurisdiction to assess whether an "agency withheld requested records willfully, wantonly, or unreasonably." <u>Bowling</u>, 75 A.3d at 470.  Accordingly, this Court has the authority to assess a Commonwealth agency's compliance with the RTKL, and to impose statutory sanctions, including civil penalties.  <u>Phila. DA</u>.

The current record supports civil penalties.  Because the statute caps the penalty amount, and there is evidence demonstrating DOC's bad faith, it is unnecessary to hold a hearing as to the amount of penalties.  <u>Phila. DA</u>.

---

[10] In the fact-finding phase, Requester also sought penalties in the amount of $500 per day under Section 1305(b) of the RTKL, 65 P.S. §67.1305(b), for DOC's noncompliance with the Disclosure Order.  Such penalties are reserved for noncompliance with a court order.

Here, the maximum statutory civil penalty is warranted based on DOC's noncompliance throughout the RTKL process, as described above. The amount corresponds to the degree of noncompliance, and the repercussions of that noncompliance.

The evidence shows DOC did not conduct a thorough search for responsive records until *after* the appeals process concluded. Only after the deadline to appeal the Disclosure Order expired did DOC attest that it provided all responsive records in the 2015 Oppman Verification. Moreover, the 2015 Oppman Verification was inaccurate because DOC still did not disclose data for *all* inmate illnesses.

The duration that DOC withheld public records also weighs in favor of imposing the maximum civil penalty. DOC received the Request in September 2014. DOC made piecemeal, incomplete disclosures in 2014, 2015, and 2017. The 2014 and 2015 Disclosures were limited to cancer, pulmonary disease, and gastrointestinal disease, and excluded some cancer records as DOC withheld the Oncology Database.

In December 2016, this Court confirmed that "all responsive records" subject to the Disclosure Order included No Escape Investigation-related records and the four Inmate Illness Sources (Mortality Lists, Oncology Database, Pharmacy Contractor Reports, and PTrax) without limitation as to type of illness. Summ. Relief Op. Yet, DOC continued to withhold responsive records, and to limit them by illness type.

25

Although DOC identified additional records in discovery, the 2017 Disclosure was again incomplete. DOC has not complied with the Disclosure Order to date. Thus, DOC delayed access to public records for three years.

I award the maximum penalty to deter DOC and other agencies from disregarding their statutory duties under the RTKL. Ultimately, DOC's failure to perform the steps required upon receiving the Request precluded access to public records. It also resulted in years of litigation to obtain responsive records that DOC should have assessed and reviewed upon receipt of the Request.

## III. Conclusion

For the foregoing reasons, I conclude DOC committed bad faith so as to warrant statutory penalties in the maximum amount of $1,500 pursuant to Section 1305(a) of the RTKL, 65 P.S. §67.1305(a).

In the event Requester intends to pursue its request for attorney fees, under either the RTKL or another statute, it shall so advise the Court in writing within thirty (30) days. Requester shall also submit documentation for its claim at that time.

_____
ROBERT SIMPSON, Judge

26

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Uniontown Newspapers, Inc., d/b/a   :
The Herald Standard; and Christine   :
Haines,   :
      Petitioners   :   No. 66 M.D. 2015
           :
    v.         :
           :
Pennsylvania Department of    :
Corrections,        :
      Respondent   :

## O R D E R

    **AND NOW**, this 23rd day of March, 2018, after hearing and upon review of the parties' submissions, the Pennsylvania Department of Corrections (DOC) is **ORDERED to DISCLOSE** to Uniontown Newspapers, Inc., d/b/a *The Herald Standard*, through reporter Christine Haines (Requester), **ANY and ALL RESPONSIVE RECORDS**, not previously disclosed, without limitation as to illness type, contained in the following sources as described in the foregoing opinion: Mortality Lists; the Oncology Database; and Chronic Care Clinic records (including PTrax) as of the closest date to the request date, that remain recoverable. DOC **SHALL DISCLOSE** these records to Requester **no later than twenty (20) days** from the date of this Order. Failure to comply with this court-ordered disclosure may subject DOC to penalties up to $500 per day pursuant to Section 1305(b) of the Right-to-Know Law (RTKL),[11] 65 P.S. §67.1305(b).

---

[11] Act of February 14, 2008, P.L. 6.

**Within twenty (20) days**, DOC **SHALL SUBMIT** sworn statement(s) by individuals with personal knowledge attesting to the completeness of the above-ordered disclosure, including the availability of Chronic Care Clinic records through PTrax or otherwise.

As to inmate medication information, DOC **SHALL OBTAIN and DISCLOSE** records from its pharmaceutical contractor (Pharmacy Contractor) showing the number of inmates on therapeutic classes of medications, unlimited as to disease type, **within thirty (30) days**. Inmate medication information SHALL BE OBTAINED in the format in which it exists, without reformatting or extrapolation; however, inmate identifiers, including names, shall be redacted or otherwise removed prior to disclosure. Pharmacy Contractor IS NOT REQUIRED to convert inmate medication information into the same format as the previously disclosed Pharmacy Contractor Reports (relating to pulmonary and gastrointestinal diseases). The inmate medication information disclosure shall be accompanied by sworn statements by persons with knowledge as to Pharmacy Contractor's records, including the compilation process. In the event DOC does not obtain responsive records from Pharmacy Contractor within the prescribed timeframe, DOC **SHALL SUBMIT** sworn statement(s) detailing its efforts to obtain the information, unlimited as to disease type, from Pharmacy Contractor **within thirty (30) days**, including when the records are anticipated.

**AND**, Requester's request for civil penalties under Section 1305(a) of the RTKL, 65 P.S. §67.1305(a), is **GRANTED**. The maximum civil penalty in the

amount of $1,500 is imposed against DOC and in favor of Requester. Counsel **SHALL FILE** a verified statement of the payment **within thirty (30) days**.

 **AND FURTHER**, as to Requester's request for attorney fees, **within thirty (30) days**, Requester **SHALL ADVISE** the Court in writing of its intent to pursue attorney fees, and also **SUBMIT** any documentation upon which it will rely. Thereafter, this Court may issue a briefing schedule and/or schedule a hearing.


_____
ROBERT SIMPSON, Judge