# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert M. Heiligman,  :
                Petitioner  :
                                 :   No. 165 C.D. 2025
            v.  :
                                 :   Submitted: February 4, 2026
Pennsylvania Department of  :
Agriculture (Office of Open Records),  :
                Respondent  :

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE LORI A. DUMAS, Judge
                HONORABLE MARY HANNAH LEAVITT, Senior Judge

## _OPINION NOT REPORTED_

**MEMORANDUM OPINION BY**
**JUDGE DUMAS**                                      **FILED: March 13, 2026**

          Robert M. Heiligman (Heiligman) has petitioned this Court to review a Final Determination issued by the Office of Open Records (OOR) on January 31, 2025. Through that Final Determination, the OOR denied Heiligman's appeal regarding the Pennsylvania Department of Agriculture's (Department) denial of his Right-to-Know Law (RTKL)[1] request, which pertained to necropsies performed in Pennsylvania on two deceased animals from the Brandywine Zoo in Wilmington, Delaware. We affirm.

---

[1] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

# I. BACKGROUND[2]

In order to properly contextualize the matter currently before us, we must first recount what transpired regarding a previous, similar RTKL request made by Heiligman. On June 13, 2024, the Department received an RTKL request from Heiligman, through which he made the following request for records that pertained to an animal that had died at the Brandywine Zoo:

> Complete pathology records pertaining to the necropsy of Haechan, a pudu (very small deer). Necropsy was performed through the Pennsylvania Animal Diagnostic Laboratory System (PADLS) New Bolton Center (NBC). Accession Number N2222607. Date of (final) report 07/25/2022. Case Coordinator Dr. Susan Bender. Please include the Final Report AND all other notes and correspondence regarding the necropsy (including correspondence between the NBC and the Associated Parties listed in the report, such as Samantha King, DVM[,] and the Brandywine Zoo). Please include measured physical data[,] such as the weight and dimensions of the corpse[,] and please also include any photographs that were taken of the intact corpse, parts[,] or organs of the corpse[,] and photos of histopathological specimens including the major organs (such as the kidneys). I would appreciate delivery of the documents in an electronic form (e.g. .pdf or .jpg files). Thank you very much.

Final Determination, 10/29/24, at 1. On July 22, 2024, the Department granted this request in part, "asserting that to the extent that the [r]equest sought records in the possession of the Department, it was providing a responsive final necropsy report, and record of the submission request to the [NBC] from the Brandywine Zoo to have the subject necropsy done [on Haechan]." Dep't's Resp. to Heiligman's Haechan

---

[2] We draw the bulk of this section's substance from the OOR's Final Determination in this matter, as well as the OOR's Final Determination regarding Heiligman's RTKL request for similar information relating to the death of another animal at the Brandywine Zoo. *See generally* Final Determination, 1/31/25; Final Determination, 10/29/24.

RTKL Request, 7/22/24, at 1. The Department also denied this request in part, asserting that it did not have the sought-after photographs in its possession, custody, or control. *Id.*

Heiligman replied on July 22, 2024, with what amounted to a reconsideration request. The Department then issued an amended response on July 24, 2024, through which it clarified its original response by explaining that the Haechan necropsy had not been conducted at the Department's behest, as well as that NBC was not a Department appendage. Dep't's Am. Resp. to Heiligman's Haechan RTKL Request, 7/24/24, at 2. Accordingly, the Department took the position that the requested materials did not constitute Department records for purposes of the RTKL and that it had divulged the final necropsy report and submission request to Heiligman as a matter of grace, despite not being legally obligated to do so under the RTKL. *Id.*

Heiligman then appealed the Department's partial denial of his RTKL request for Haechan-related records to the OOR on July 25, 2025. The OOR subsequently dismissed the appeal as moot in part and denied it in part on October 29, 2024. Specifically, the OOR ruled that the appeal had been rendered partially moot, because the Department had divulged some additional materials during the pendency of Heiligman's OOR appeal, as well as that the remaining requested materials did not constitute Department records or, alternatively, were not in the Department's possession, custody, or control. Heiligman did not appeal the OOR's disposition of his Haechan-related RTKL request.

On January 3, 2025, the Department received a second, similar RTKL request from Heiligman, through which he sought the following materials regarding

two additional pudus from the Brandywine Zoo upon whom necropsies had been performed at NBC:

> [1.] Complete records of a necropsy performed on Clover, a female southern pudu (very small deer), who was a resident of the Brandywine Zoo (in Wilmington, Delaware) and who died on or about October 24, 2024. This necropsy was likely performed at [NBC], University of Pennsylvania, one of three institutions comprising the . . . PADLS[], which is administered by the . . . Department . . . . Please include any and all records, communications, documents and files regarding this necropsy that were uploaded to the PADLS shared database known as USALIMS (or as PADLS Online).
>
> [2.] Complete records of a necropsy performed on an un-named southern pudu fawn, delivered by Caesarian Section, from the above mentioned Clover, as a stillborn on or about October 24, 2024. Please include any and all records, communications, documents and files regarding this necropsy that were uploaded to the PADLS shared database known as USALIMS (or as PADLS Online).

Final Determination, 1/31/25, at 1. The Department denied this request on January 10, 2025, because these necropsies had not been performed at the Department's behest and, in the Department's view, the related materials were therefore not its records for purposes of the RTKL.

Heiligman then appealed this denial to the OOR on January 17, 2025. The OOR subsequently denied Heiligman's appeal, on the basis that the Department had established by a preponderance of the evidence that the requested material did not qualify as Department records under the RTKL, because the material did not pertain to a Department transaction or activity. This appeal to our Court followed shortly thereafter.

4

## II. DISCUSSION

### *A. Issues on Appeal*

Heiligman offers four arguments for our consideration, which we summarize as follows. First, Heiligman asserts that the Department could not deny his request for records pertaining to the necropsies performed upon Clover and her fawn because the Department had deemed analogous materials regarding the Haechan necropsy to be its records pursuant to the RTKL and had consequently disclosed them to Heiligman. Heiligman's Br. at 18-31. Second, Heiligman maintains that the requested materials documented a Department transaction, business, or activity, and should therefore be considered public records under the RTKL, because NBC is part of PADLS. *Id.* at 31-45. Third, Heiligman states that the necropsies of Clover and her fawn triggered a duty to report the deaths to Department's Bureau of Animal Health and Diagnostic Services (BAHDS) because the necropsies revealed that their deaths were caused by a disease; Heiligman further posits that the resultant materials document a Department transaction or activity and, thus, are public records that must be disclosed by the Department pursuant to the RTKL. *Id.* at 45-59. Finally, Heiligman contends that he should be awarded reasonable costs of litigation, pursuant to Section 1304 of the RTKL, 65 P.S. § 67.1304, due to the Department's handling of his RTKL request in this matter. *Id.* at 60-65.

### *B. Standard of Review and Relevant Legal Considerations*

The RTKL is designed "to promote access to official government information in order to prohibit secrets, scrutinize the actions of public officials[,] and make public officials accountable for their actions." *Off. of Governor v. Raffle*, 65 A.3d 1105, 1107 n.1 (Pa. Cmwlth. 2013). Accordingly, Commonwealth agencies

5

are statutorily required to "provide public records [to individuals who request them] in accordance with [the RTKL]." Section 301(a) of the RTKL, 65 P.S. § 67.301(a). The RTKL mandates that our Court constitutes the ultimate finder-of-fact in an appeal that pertains to an RTKL request that was submitted to a Commonwealth agency and, consequently, that we must conduct a *de novo*, plenary review of an OOR final determination regarding such a request. *See Bowling v. Off. of Open Recs.*, 75 A.3d 453, 467-74 (Pa. 2013). When performing this duty, we are allowed to consider evidence beyond that which was submitted to the OOR. *Id.* at 476-77. By the same token, however, we are permitted to "adopt[] . . . the [OOR's] factual findings and legal conclusions when appropriate." *Id.* at 474.

In relevant part, the RTKL defines "record" as "[i]nformation, regardless of physical form or characteristics, that documents a transaction or activity of an agency and that is created, received or retained pursuant to law or in connection with a transaction, business or activity of the agency." Section 102 of the RTKL, 65 P.S. § 67.102. "Whether a record is 'of an agency' is a fact-specific inquiry[.]" *Penncrest Sch. Dist. v. Cagle*, 341 A.3d 720, 735 (Pa. 2025). "In discerning whether records qualify as records 'of' a particular agency, we consider the subject-matter of the records." *Grine v. Cnty. of Centre*, 138 A.3d 88, 95 (Pa. Cmwlth. 2016) (cleaned up). Furthermore, "[t]he location of the record or an agency's possession does not guarantee that a record is accessible to the public; rather, the character of the record controls. A record does not need to be generated by the agency receiving a RTKL request to qualify as 'of' that agency." *Id.* (cleaned up).

6

## C. Analysis

Heiligman's first argument appears to be predicated upon a misunderstanding of the RTKL framework. As discussed, this Court is the ultimate finder-of-fact in appeals such as this one, which emanates from an RTKL request that was lodged with a Commonwealth agency. *See Bowling*, 75 A.3d 453, 467-74. We are not bound in this kind of appeal by the Department's or the OOR's factual determinations regarding whether the requested materials constitute its records for purposes of the RTKL; instead, we must make our own findings on that point, as we do not accord any deference to those determinations under the RTKL framework. *See id.* at 472-74. In other words, the Department's conclusion that the requested materials are not its records, despite providing Heiligman with substantially similar materials in another RTKL matter, has no bearing on the outcome of this appeal.

Next, we conclude that the record does not support Heiligman's assertion that NBC is a Department subsidiary. In the Department's OOR position statement, it described NBC as "a laboratory of the University of Pennsylvania, School of Veterinary Medicine." Dep't's OOR Position Statement at 3. The Department also explained therein that "NBC is one of three laboratories that make up . . . PADLS. Each of the PADLS laboratories perform both (1) regulatory testing for [the Department's] BAHDS and (2) diagnostic testing at the request of private parties for a fee." *Id.* at 2 (cleaned up). The Department then went on to aver that the only "parties involved in the necrops[ies of Clover and her fawn] were (1) the Brandywine Zoo . . . and (2) NBC," who were both acting in exclusively private, nongovernmental capacities. *See id.* at 3. In a footnote, the Department cited to the website that pertains to NBC's diagnostic laboratories. *See id.* at 3 n.2 (citing *New Bolton Center Diagnostic Laboratories*, PENNVET, UNIVERSITY OF PENNSYLVANIA,

7

https://www.vet.upenn.edu/veterinary-hospitals/NBC-hospital/diagnostic-laboratories). This website mentions that NBC is affiliated with PADLS but also makes clear that NBC is part of the University of Pennsylvania's School of Veterinary Medicine and offers a variety of services beyond those undertaken on behalf of or in relation to PADLS.[3]

The Department largely reiterates these assertions in the brief that it submitted to this Court. *See* Dep't's Br. at 9-11, 15-16. Therein, the Department also cites to the page on NBC's website that specifically discusses PADLS. *See id.* at 10 n.4 (citing *New Bolton Center PADLS*, PENNVET, UNIVERSITY OF PENNSYLVANIA, https://www.vet.upenn.edu/veterinary-hospitals/NBC-hospital/diagnostic-laboratories/new-bolton-center-padls). That page describes PADLS as "a tripartite system which joins together the University of Pennsylvania, the Pennsylvania Department of Agriculture, and the Pennsylvania State University, and is dedicated to the health, safety and welfare of families here and abroad." This page also states that NBC is "affiliated with the University of Pennsylvania School of Veterinary Medicine in Kennett Square[,]" as well as that "[t]he partnership of the university laboratories in the PADLS mission provides a unique opportunity to integrate research and teaching."[4]

Additionally, the Department has offered an attestation from Susan West, in which she identified herself as the Department's "Annuitant Agency Open Records Officer[.]" West Attestation at 16. Of particular relevance, Ms. West

---

[3] *See New Bolton Center Diagnostic Laboratories*, PENNVET, UNIVERSITY OF PENNSYLVANIA, https://www.vet.upenn.edu/veterinary-hospitals/NBC-hospital/diagnostic-laboratories (last accessed Mar. 12, 2026).

[4] *New Bolton Center PADLS*, PENNVET, UNIVERSITY OF PENNSYLVANIA, https://www.vet.upenn.edu/veterinary-hospitals/NBC-hospital/diagnostic-laboratories/new-bolton-center-padls (last accessed Mar. 12, 2026).

attested that she had conducted a good faith search of the Department's records, conferred with BAHDS' staff, and had concluded on the bases of that search and those discussions that "it was evident that the necropsies were not done at the request of [the Department]; rather, they were requested by a private non-Commonwealth entity. . . . Therefore, the requested documents were not records of the [Department,] but were that of a private transaction between the NBC lab and the Brandywine Zoo." *Id.*

As for Heiligman, he counters the Department's position on this point by offering a number of legal and factual arguments. First, he asserts that NBC is a subsidiary of PADLS, because all of the Haechan-related necropsy materials he received were printed on PADLS letterhead. Heiligman's Br. at 33-34. Second, Heiligman references various sections of the Animal Health and Diagnostic Act (Diagnostic Act);[5] in doing so, he posits that the Diagnostic Act establishes that "the coordination of 'animal health, animal research and animal diagnostic programs in this Commonwealth' is a core mission of the [Animal Health and Diagnostic Commission (Diagnostic Commission)],"[6] as well as of BAHDS and of the broader Department. *See id.* at 35-37 (cleaned up). Third, Heiligman cites to a litany of Department webpages that pertain to the operation and administration of PADLS, as well as to how PADLS' services are offered to the general public. *See id.* at 37-41.

---

[5] Act of Dec. 14, 1988, P.L. 1198, 3 P.S. §§ 430.1-.8.

[6] The Diagnostic Act created the Diagnostic Commission and placed it within the Department. 3 P.S. § 430.3. It also vested the Diagnostic Commission with the following duties and responsibilities: (1) administrative rulemaking; (2) grant issuance; (3) receipt, management, and expenditure of operational funding; (4) coordination of animal health, animal research[,] and animal diagnostic programs in the Commonwealth, in a manner that does not interfere with the Department's performance of its statutory duties; (5) acquisition of data regarding animal disease diagnosis and animal health research; and (6) "mak[ing] recommendations to the General Assembly and to the Department . . . regarding animal health research, animal disease diagnosis[,] and indemnification for losses caused by animal disease." 3 P.S. § 430.5.

Fourth, he states that an organization known as the American Association of Laboratory Veterinary Diagnosticians has accredited PADLS' laboratories as a unit, rather than individually. *Id.* at 41-43. Finally, he asserts that NBC likely billed Brandywine Zoo through PADLS for Clover and her fawn's necropsies, Brandywine Zoo probably paid these invoices directly to PADLS, and that those payment funds were possibly commingled with other Department funds in an account established pursuant to the Diagnostic Act. *See id.* at 43-44.

We conclude that the preponderance of the evidence is in favor of the Department's position. As recounted above, NBC holds itself out as part of the University of Pennsylvania's School of Veterinary Medicine, while also making clear that, though it is affiliated with PADLS for certain purposes, it also provides services to private parties independent of any Department-related responsibilities. This position squares with Ms. West's testimonial assertion that the necropsies of Clover and her fawn were done as private transactions between the Brandywine Zoo and NBC. *See Off. of the Dist. Att'y of Phila. v. Bagwell*, 155 A.3d 1119, 1130 (Pa. Cmwlth. 2017) (agencies may justify nondisclosure of requested materials via credible, relevant, and sufficiently specific testimonial affidavits). By contrast, Heiligman's assertions are largely based upon evidence *dehors* the record (regarding the necropsy of Haechan),[7] a complete misreading of the Diagnostic Act (which, by its plain terms, did not create NBC or cause the Department to take full control of

---

[7] Heiligman asserts that numerous items from the OOR's Haechan proceeding have been "incorporated by reference" into the record for this matter. *See* Heiligman's Br. at 33-34; *id.* at 33 nn.27-28, 37 n.29, 41 n.30. These assertions ignore the fact that we do not have access to the materials from the OOR's Haechan docket. Accordingly, we have disregarded the materials that Heiligman has sought to incorporate by reference into this matter's record, to the extent that those materials are not readily available to us (*e.g.,* via hyperlink). *See Galloway v. Off. of Pa. Atty. Gen.*, 63 A.3d 485, 487 n.3 (Pa. Cmwlth. 2013) (this Court will not consider any materials in an RTKL matter that are *dehors* the record).

10

that laboratory),[8] and pure speculation (regarding billing and payment for the necropsies of Clover and her fawn). Consequently, we conclude that NBC is not a Department subsidiary and, thus, that the requested materials did not document a Department transaction, business, or activity simply because the necropsies of Clover and her fawn were performed at NBC.

Next, there is no merit to Heiligman's assertion that the deaths of Clover and her fawn were caused by a disease and thus transmutes their necropsies into Department records. Per Section 2327(b) of the Domestic Animal Law (Law), in relevant part, "[i]t shall be the duty of every practitioner of veterinary medicine and every diagnostic laboratory in this Commonwealth, immediately upon receiving information thereof, to report to the [D]epartment each case of any dangerous transmissible disease[.]" 3 Pa.C.S. § 2327(b). "Dangerous transmissible disease" is defined in Section 2303 of the Law as

> [a] transmissible disease of domestic animals that has been designated [through the Law] or by order of the Department . . . as presenting a danger to public health, to domestic animal health, to the safety or quality of the food supply[,] or to the economic well-being of the domestic animal industries. This term shall be construed to mean and include the disease agent.

*Id.* § 2303.[9] In addition, Section 2321 of the Law specifically designates 40 different transmissible diseases as "dangerous" and provides the Department with discretionary authority to designate other transmissible diseases in this manner, which the Department may do via regulation or temporary order. *Id.* § 2321.

---

[8] *See* 3 P.S. §§ 430.1-.8.

[9] "Domestic animal" is defined in Section 2303 of the Law as "[a]n animal maintained in captivity. The term also includes the germ plasm, embryos[,] and fertile ova of such animals." 3 Pa.C.S. § 2303. Both Clover and her stillborn fawn therefore constituted domestic animals for purposes of the Law.

11

With these legal precepts in mind, we conclude that there is no record evidence that the necropsies of Clover and her fawn revealed any such dangerous transmissible disease. As stated by the Brandywine Zoo in its announcement of the pudus' deaths, the "[n]ecropsy results showed that Clover died of a systemic infection of unknown origin. The infection had spread to her heart, stomach, uterus, and placenta despite showing no outward sign of infection. It was this infection that also led to the fawn being stillborn." Heiligman's OOR Appeal, 1/17/25, at 16 (screenshot of Brandywine Zoo webpage announcement regarding deaths of Clover and her fawn). Absent evidence that these necropsies revealed a specific transmissible disease that both caused the pudus' deaths and had been declared "dangerous" under the law by either the Department or the General Assembly, these necropsies did not trigger any duty for NBC or its staff to report the pudus' deaths to the Department.[10]

Finally, we disagree with Heiligman's assertion that he should be awarded reasonable costs of litigation pursuant to Section 1304 of the RTKL. In the context of the RTKL, "bad faith" does not require a showing of fraud or corruption. *Uniontown Newspapers, Inc. v. Pa. Dep't of Corr*., 185 A.3d 1161, 1170 (Pa. Cmwlth. 2018) (Simpson, J., single judge op.).[11] Rather, a requester need only show

---

[10] Much of Heiligman's argument regarding this specific issue appears to be predicated upon his belief that the Department should have issued regulations and temporary orders that designate a far wider swath of transmissible diseases as "dangerous" pursuant to the Law. *See* Heiligman's Br. at 47-59. The question of whether the Department has properly exercised its discretionary authority in this area falls far outside the scope of question that is properly before us, *i.e.*, whether the specific illness that killed Clover and her fawn has been expressly designated as a "dangerous transmissible disease" under the Law.

[11] With the exception of reported, single-Judge, election law-related opinions that were issued after October 1, 2013, "a single-Judge opinion of this Court, even if reported, shall be cited only for its persuasive value and not as a binding precedent." Section 414(b) of this Court's Internal Operating Procedures, 210 Pa. Code. § 69.414(b).

12

that the agency has exhibited a "lack of good faith compliance with the RTKL and an abnegation of mandatory duties under its provisions." *Id.*; *accord Bagwell*, 155 A.3d at 1141. The party asserting bad faith bears the burden of proving its existence. *Anand v. Pa. Ins. Dep't*, 329 A.3d 1, 22 (Pa. Cmwlth. 2024), *appeal denied*, 348 A.3d 87 (Pa. 2025). Furthermore, when acting as the factfinder in an RTKL dispute, a court must address any allegations of bad faith by issuing sufficiently detailed factual findings and legal conclusions. *See Bagwell*, 155 A.3d at 1140; *Bowling*, 621 A.3d at 476.

The RTKL specifically allows for two different types of monetary sanctions to be imposed as a consequence of an agency's failure to act in good faith. First, a Court may award a requester attorney's fees and costs in the event it concludes that an agency "willfully or with wanton disregard deprived the requester of access to a public record subject to access or otherwise acted in bad faith under the provisions of this act; or . . . the exemptions, exclusions or defenses asserted by the agency in its final determination were not based on a reasonable interpretation of law." Section 1304(a) of the RTKL, 65 P.S. § 67.1304(a). Second, a "[C]ourt may impose a civil penalty of not more than $1,500 if an agency denied access to a public record in bad faith." Section 1305(a) of the RTKL, 65 P.S. § 67.1305(a). Notably, however, a Court may award sanctions under Section 1304(a) of the RTKL only in the event it "reverses the final determination of the appeals officer or grants access to a record after a request for access was deemed denied[.]" 65 P.S. § 67.1304(a); *see Uniontown Newspapers, Inc. v. Pa. Dep't of Corr.*, 243 A.3d 19, 34 (Pa. 2020) (quoting *Uniontown Newspapers, Inc. v. Pa. Dep't of Corr.*, 197 A.3d 825, 835 (Pa. Cmwlth. 2018) (Simpson, J., single judge op.)) ("Section 1304(a)(1)

'permit[s] recovery of attorney fees when the receiving agency determination is reversed, and it deprived a requester of access to records in bad faith.'").

We have made no such reversal or grant of access in this matter. To the contrary, and as explained at length *supra*, we fully agree with the Department that it need not disclose the materials requested by Heiligman because those materials do not constitute the Department's records under the RTKL. Accordingly, we have no reason to award Heiligman reasonable costs of litigation.[12]

---

[12] We note that Heiligman bases his bad faith argument upon his position that the Department determined that certain materials in the Haechan RTKL matter were its records, but then decided that substantially similar materials in this matter were not its records. *See* Heiligman's Br. 60-65. Heiligman rests this assertion upon what the Department wrote in its July 22, 2024 response to his Haechan RTKL request. *See id.* In doing so, Heiligman conspicuously and disconcertingly ignores the substance of the Department's July 24, 2024 response to his Haechan RTKL request, in which the Department explicitly clarified that it did not consider the materials it had divulged in response to the Haechan RTKL request to be its records for purposes of the RTKL. *See* Dep't's Am. Resp. to Heiligman's Haechan RTKL Request, 7/24/24, at 2. This is especially curious, given that Heiligman begrudgingly acknowledges both the existence and substance of the Department's July 24, 2024 response in earlier portions of his brief. *See, e.g.*, Heiligman's Br. at 12-14, 19-20, 27-31. Heiligman was thus well aware prior to filing of his RTKL request in this matter that, at minimum, the Department had changed its position regarding both the nature of the materials he sought and whether it had any legal obligation to disclose those materials to him. We caution Heiligman that similar omissions and lack of candor in future RTKL appeals may lead to the imposition of appropriate sanctions. *See* Section 1304(b) of the RTKL, 65 P.S. § 67.1304(b) ("**Sanctions for frivolous requests or appeals.--**The court may award reasonable attorney fees and costs of litigation or an appropriate portion thereof to an agency or the requester if the court finds that the legal challenge under this chapter was frivolous.").

### III. CONCLUSION

In accordance with the foregoing analysis, we affirm the OOR's Final Determination and deny Heiligman's request for an award of reasonable costs of litigation.

**LORI A. DUMAS, Judge**

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert M. Heiligman, :
         Petitioner :
          : No. 165 C.D. 2025
         v. :
          :
Pennsylvania Department of :
Agriculture (Office of Open Records), :
         Respondent :

## O R D E R

AND NOW, this 13th day of March, 2026, it is hereby ORDERED:

1. The Final Determination issued by the Office of Open Records on January 31, 2025, is AFFIRMED;

2. Robert M. Heiligman's request for an award of reasonable costs of litigation is DENIED.

 

**LORI A. DUMAS, Judge**