**[J-49A-2020 and J-49B-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| UNIONTOWN NEWSPAPERS, INC., D/B/A THE HERALD STANDARD; AND CHRISTINE HAINES, | : | No. 76 MAP 2019 |
| | : | |
| | : | Appeal from the Order of the Commonwealth Court at No. 66 MD 2015 dated March 23, 2018. |
| Appellees | : | |
| | : | |
| | : | ARGUED: May 21, 2020 |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| PENNSYLVANIA DEPARTMENT OF CORRECTIONS, | : | |
| | : | |
| | : | |
| Appellant | : | |
| UNIONTOWN NEWSPAPERS, INC., D/B/A THE HERALD STANDARD; AND CHRISTINE HAINES, | : | No. 77 MAP 2019 |
| | : | |
| | : | Appeal from the Order of the Commonwealth Court at No. 66 MD 2015 dated October 29, 2018. |
| Appellees | : | |
| | : | |
| | : | ARGUED: May 21, 2020 |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| PENNSYLVANIA DEPARTMENT OF CORRECTIONS, | : | |
| | : | |
| | : | |
| Appellant | : | |

**OPINION**

**JUSTICE MUNDY**                                   **DECIDED: December 22, 2020**

We granted appeal in this matter to consider the assessment of sanctions and attorney fees based on a finding of bad faith and willful and wanton behavior by an agency responder under the Right to Know Law (RTKL).[1]

In September 2014, prior to the request for the records at issue in this case, the Abolitionist Law Center published a report entitled "No Escape: Exposure to Toxic Coal Waste at [SCI-]Fayette." The report alleged a causal connection between the ill health of inmates at SCI-Fayette, and the facility's proximity to a fly ash dumpsite. In response to the report, the Department of Corrections (DOC) coordinated with the Department of Health (DOH) to investigate the allegations (the No Escape Investigation). Christopher Oppman, who was then the Director of the DOC's Bureau of Health Care Services, oversaw the No Escape Investigation, which was led by Drs. Paul Noel and Eugene Ginchereau. In conducting the No Escape Investigation, the DOC consulted many sources of information. These included "causes of inmate deaths (Mortality Lists); a database that tracked inmates treated for cancer (Oncology Database); reports of inmate medications prepared by DOC's pharmacy contractor (Pharmacy Contractor Reports); and, records showing inmates enrolled in Chronic Care Clinics, tracked via the PTrax database (collectively, Inmate Illness Sources)." *Uniontown Newspapers, Inc. v. Pa. Dep't of Corr.*, 185 A.3d 1161, 1164-65 (Pa. Cmwlth. 2018) (*Uniontown II*).

On September 25, 2014, reporter Christine Haines of The Herald Standard (Appellees) sent an e-mail RTKL request to the DOC, seeking:

> documentation of illnesses contracted by inmates and/or staff members at SCI-Fayette. I am not seeking identifying information, only the types of reported contracted illnesses and the number of inmates and staff members with those illnesses. I am particularly interested in various types of cancer reported at SCI-Fayette since its opening, as well as respiratory ailments reported. If there is also information

---

[1] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

> comparing the health at SCI-Fayette with the health at other state correctional facilities, that would also be helpful.

*Uniontown Newspapers, Inc. v. Pa. Dep't of Corr.*, 151 A.3d 1196, 1200 (Pa. Cmwlth. 2016) (*Uniontown I*).

DOC assumed Appellees' request related to the Abolitionist Law Center's report and the No Escape Investigation. *Uniontown II*, 185 A.3d at 1165. DOC's open records officer, Andrew Filkosky, issued a denial of Appellees' request in its entirety, citing several exceptions under Section 708(b) of the RTKL, as well as attorney-client privilege and deliberative process privilege grounds. Appellees appealed and, on December 1, 2014, the Office of Open Records (OOR) reversed, ordering DOC to disclose to Appellees "all responsive records" within 30 days. DOC did not file a petition for review of this determination with the Commonwealth Court.

On December 31, 2014, in-house counsel for DOC, Chase DeFelice, disclosed 15 pages of records to Appellees. The disclosed records included "charts depicting the following: the number of patients with pulmonary conditions in all SCIs (from Chronic Care Clinic records); the number of inmates with cancer in all SCIs (2010–13); inmate cancer deaths by institution (2010–13); inmate cancer deaths at SCI–Fayette (2003–13); the number of inmates treated by Pharmacy Contractor for pulmonary ailments (2010–14); and, the number of inmates treated by Pharmacy Contractor for gastrointestinal ailments (2010–14)." *Id.* (citation omitted). In January 2015, Appellees asked DOC to verify that its December 31, 2014 disclosure was a complete response to the request for records. After undertaking an additional review, DOC disclosed a memorandum from Dr. Ginchereau to Dr. Noel, as well as an e-mail from Dr. Noel about the investigation, and a day later disclosed cancer patient records from November 2014 and January 2015. At this juncture, Director Oppman verified that the DOC "had no other records of SCI–

Fayette inmate illnesses by type and quantity[,] and comparison of illness rates at other [SCIs]." *Id.* (brackets in original, internal quotation marks and citation omitted).

In February 2015, Appellees filed a petition for enforcement with the Commonwealth Court, seeking statutory sanctions and attorney fees alleging DOC demonstrated bad faith in responding to the request for records, and the OOR's directive. DOC filed preliminary objections, which were overruled. DOC thereafter filed an answer and new matter. Appellees filed a motion for judgment on the pleadings, which the court denied.[2] After further discovery, the parties filed cross-motions for summary relief.

A three-judge panel of the Commonwealth Court first considered whether DOC had complied with the OOR's Disclosure Order. DOC contended it provided all responsive records based on its reasonable interpretation of the scope of the request. The panel granted DOC's motion in part and denied it in part. Specifically, it held DOC was not required to disclose individual inmate medical records or to create new records compiling data from those records not already created or that would not be created in regular course. *Uniontown I*, 151 A.3d at 1207 (Pa. Cmwlth. 2016). However, in addition to records created as part of the No Escape Investigation, the Commonwealth Court identified the following records that DOC should have provided: (1) the Chronic Care Clinics Database; (2) the Oncology Database; (3) Mortality Lists; and (4) Pharmacy Contractor Reports, set forth above. *Id.* at 1205. Because the panel could not discern the full extent of any non-compliance by DOC, the panel directed the parties to file a stipulation as to the disclosure status of these five classes of records. The panel denied

_____

[2] Senior Judge J. Wesley Oler, Jr. issued this ruling in an unpublished single-judge opinion. *See Uniontown Newspapers v. Dep't of Corr.* (Pa. Cmwlth., No. 66 M.D. 2015, filed December 7, 2015). Therein, he held judgment on the pleadings was inappropriate because an issue of material fact existed concerning whether the DOC's interpretation of and/or response to the request for records was reasonable or made in bad faith.

Appellees' motion without prejudice and reserved judgment on the issue of bad faith sanctions. *Id.* at 1209

The parties engaged in further discovery. During this process, in March 2017, DOC disclosed additional mortality lists and data from its oncology database. After discovery was complete, the parties filed a stipulation that the "Pharmacy Contractor Reports and Chronic Care Clinic records remained outstanding." *Uniontown II*, 185 A.3d at 1166. The Commonwealth Court held a hearing in August 2017, and the parties filed proposed findings of fact and conclusions of law in October 2017.

In a single-judge opinion and order entered on March 23, 2018, the court proceeded to review Appellees' alleged grounds for finding DOC acted in bad faith, specifically, that DOC construed the record request too narrowly; DOC failed to search records; and DOC failed to comply with the OOR's Disclosure Order. It addressed DOC's compliance at each stage, including its construction of the request, responsive actions upon receipt of the record request, its actions at the appeal stage before the OOR, and its degree of compliance with the disclosure order of the OOR.

With respect to the construction of the request, the court first noted that nothing in the request for information referenced the No Escape Investigation, and that DOC's assumption that the request related only to records related to that investigation stemmed merely from the coincidental timing of the request. The court noted that Appellees presented no evidence of communications with DOC clarifying the parameters of the request. The court further found that DOC's open records officer merely forwarded the request to DOC's Health Care Bureau without an interpretation of the request, and reflexively accepted the Health Care Bureau's subsequent interpretation. Absent any showing of an attempt to construe the request in any particular adverse manner, the court determined that DOC's erroneously narrow interpretation of the request did not itself

amount to bad faith. Rather, it noted, "the primary problem revealed during the hearing was that DOC did not give any specific, *separate* consideration to the Request at all." *Uniontown II*, 185 A.3d at 1171 (emphasis in original).

The court observed that, during the appeal stage before the OOR, DOC represented to the OOR that it possessed records that were responsive to Appellees' request, but the records were exempt from disclosure. The basis for this representation was a verification DOC's in-house counsel prepared for the Director of DOC's Bureau of Health Care Services, who also oversaw the No Escape Investigation. Critically, counsel submitted this verification to the OOR without ever obtaining or reviewing the records. *Id.* at 1173. Judge Simpson concluded that "by contesting access during the appeal, without obtaining all records and assessing the records' public nature, DOC acted in bad faith." *Id.*

Once the OOR ordered disclosure within 30 days, "DOC bore the burden to prove it provided all responsive records." *Id.* (internal quotation marks omitted). The court found that DOC waited until after the 30-day period had passed before confirming whether it had searched for all potentially responsive records. *Id.* In addition, DOC failed to disclose all mortality lists and the oncology database data until months beyond the deadline. *Id.* Furthermore, DOC did not contact its pharmacy contractor until 2017 in order to obtain potentially responsive records held by the contractor. *Id.* The court determined this further evidenced a lack of good faith on the part of DOC. *Id.* at 1174. In addition, due to DOC's tardiness, certain chronic care clinic records were not preserved and were no longer available. *Id.*

Concluding DOC responded in bad faith, the court then turned to the relief due to Appellees. First, the Commonwealth Court ordered disclosure of certain classes of

remaining responsive records within 20 days.[3]  *Id.*  In addition, the court observed that the RTKL permits sanctions up to $1,500.00 "if an agency denied access to a public record in bad faith."  65 P.S. § 67.1305(a).  Based on its findings, the court concluded that the maximum amount of sanctions was appropriate in this case.  The court deferred any resolution of Appellees' request for attorney fees.  The court directed Appellees to advise the court in writing of its intent to pursue its claim for attorney fees together with any supporting documentation, whereupon further briefing and/or hearing would be scheduled.

Appellees subsequently pursued their claim for attorney fees.  The court conducted a hearing on the issue of what constituted "reasonable" attorney fees in this case.  Ultimately, by order entered on October 29, 2018, the Commonwealth Court awarded Appellees attorney fees of $118,458.37.  *Uniontown Newspapers, Inc. v. Pa. Dep't of Corr.*, 197 A.3d 825 (Pa. Cmwlth. 2018) (*Uniontown III*).  Therein, the court clarified that it resolved the issue of bad faith in its earlier decision and accepted that finding for the purpose of determining reasonable attorney fees in the instant proceeding.  *Id.* at 830.

DOC filed a petition for allowance of appeal, which this court granted, limited to the following issues:

> 1.  Where RTKL Sections 65 P.S. §67.1304 and §67.1305 premise the award of sanctions and attorney fees on a finding of bad faith and willful and wanton behavior, can a court impose those penalties based on a finding that the RTK responder failed to personally and independently assess the universe of documents sought, instead relying on the statement of Bureau functionaries that all otherwise responsive records are part of a noncriminal investigation, when any duty to independently and personally assess is not clearly delineated in either the statute or the case law?

---

[3] DOC does not dispute that these documents were responsive to the request, were not subject to any exclusion, and remained undisclosed.

2. Did the Commonwealth Court properly construe the statutory language in 65 P.S. §67.1304 as authorizing an award of attorney fees when a court reverses a final determination of an agency rather than when a court reverses the final determination of the appeals officer?

*Uniontown Newspapers, Inc. v. Pa. Dep't of Corr.*, 218 A.3d 375 (Pa. 2019).

I.

With respect to the first issue, DOC focuses primarily on the Commonwealth Court's findings regarding the actions of open records officer Filkosky.[4]

The court found that upon receipt of Haines request, Filkosky forwarded her e-mail to DOC's Bureau of Health Care Services without any instructions. The Bureau did not respond in writing; however, one of its employees, Cathy Montag, spoke to Filkosky and informed him that the requested records all related to the No Escape Investigation that DOC and the DOH were performing. Filkosky concluded that the only other records would be the inmates' medical files. N.T. 8/28/17, at 126-28. In addition, the court noted:

> Significantly, Filkosky did not receive any potentially responsive records from DOC's Health Care Bureau. Without understanding the records involved, he relied on DOC's Health Care Bureau's assessment that any responsive records related to the No Escape Investigation. Filkosky also did not discern what records were allegedly investigative either to document their content or to assess any exemptions. Filkosky issued DOC's denial under Section 903 of the RTKL without reviewing any records.
>
> Accordingly, DOC did not perform its duties during the request stage in several material respects. In short, DOC neglected to: perform a good faith search; obtain records from sources consulted during the No Escape Investigation; review all potentially responsive records; and assess the content of responsive records before withholding access.

---

[4] Statutory interpretation raises a question of law. Therefore, our standard of review is *de novo* and our scope of review is plenary. *Com. v. Giulian*, 141 A.3d 1262, 1266 (Pa. 2016).

*Uniontown II*, 185 A.3d at 1168.[5]

The court noted that pursuant to DOC's procedures, once the open records officer receives a RTKL request, "'**there must be no disposal of potentially responsive records** (no deletion of potentially responsive e-mails, etc.), . . . notice of the RTKL request should be considered the equivalent of a litigation hold.'" *Id.* at 1167 (citing Jt. Ex. 1 (RTKL Procedures, 2/12/12) (bold in original)). Further, DOC Policy provides, "[t]he open records officer must retain all potentially responsive records obtained from the custodian 'until further notice' regardless of a record retention schedule permitting disposal." *Id.* (citing Jt. Ex. 19 at part IV(K)(19)). Here, the Bureau of Health Care Services did not receive notice of a hold instruction. N.T. 8/28/17, at 45-46.

The court explained that the RTKL is remedial legislation designed to facilitate transparency of government information and to promote accountability. *Id.* at 1170 (*citing Bowling v. Office of Open Records*, 990 A.2d 813, 824 (Pa. Cmwlth. 2010), *aff'd.* 75 A.3d 453 (Pa. 2013)). As such, the court observed that, under the RTKL, proof of bad faith does not require establishing fraud or corruption. *Id.* Rather, an abnegation of mandatory duties by an agency, including performance of a detailed search and review of records to ascertain if the requested material exists, or if any exclusion may apply, prior to denial of access will support a finding of bad faith. *Id.* (citing *Chambersburg Area Sch. Dist. v. Dorsey*, 97 A.3d 1281 (Pa. Cmwlth. 2014)).

The court noted that Chapter 9 of the RTKL sets forth an agency's duties when responding to a request for records. Upon receiving the request, the officer "must make

---

[5] In the appeal to the OOR, DOC submitted a verification from Director Oppman dated November 4, 2014, which stated that the records Haines requested are "presently part of a noncriminal investigation that was started by the Department and now includes the Department of Health." Joint Trial Exhibit 6. The verification was prepared by Chase DeFelice, in-house counsel for DOC. The court concluded that "Oppman was not directly involved in responding to the Request during the request stage." *Uniontown II*, 185 A.3d at 1168 n.5.

a good faith effort to determine whether: (1) the record is a public record; and, (2) the record is in the possession, custody, or control of the agency." *Id.* at 1171. The officer also has a duty to "to advise all custodians of potentially responsive records about the request, and to obtain all potentially responsive records from those in possession." *Id.* at 1171-72. If the agency does not possess the records in question, but a contractor does, the agency must "take reasonable steps to secure the records from the contractor and then make a determination if those records are exempt from disclosure." *Id.* at 1172 (brackets omitted). After gathering all the relevant records, the agency must then "review the records and assess their public nature under Sections 901[6] and 903[7] of the RTKL."

---

[6] Section 901 of the RTKL provides, in relevant part:

### § 67.901.    General rule

Upon receipt of a written request for access to a record, an agency shall make a good faith effort to determine if the record requested is a public record, legislative record or financial record and whether the agency has possession, custody or control of the identified record, and to respond as promptly as possible under the circumstances existing at the time of the request.

65 P.S. § 67.901.

[7] Section 903 of the RTKL provides, in relevant part:

### § 67.903.    Denial

If an agency's response is a denial of a written request for access, whether in whole or in part, the denial shall be in writing and shall include:

(1)    A description of the record requested.
(2)    The specific reasons for the denial, including a citation of supporting legal authority.

65 P.S. § 67.903.

*Id.* As the Commonwealth Court observed, "[i]t is axiomatic that an agency cannot discern whether a record is public or exempt without first obtaining and reviewing the record." *Id.*

The court determined that the DOC did not make a good faith effort to establish whether it possessed or controlled records responsive to the request. Specifically, the court found the DOC made no search for responsive records at the request stage, instead identifying the existence of responsive records only after litigation had begun. *Id.* Moreover, the court concluded the DOC failed to obtain all records from its Health Care Bureau, Pharmacy Contractor, and other record custodians upon receiving Appellees' request. *Id.* Accordingly, the court concluded, "[w]ithout obtaining or reviewing any records, DOC denied access to responsive public records. DOC's failure to comply with Section 901 prior to issuing its 'denial' under Section 903 constitutes bad faith." *Id.*

DOC argues that the open records officer's denial of Haines' request cannot constitute bad faith because Filkosky complied with Section 502 of the RTKL, which provides, in relevant part:

> **§ 67.502.   Open-records officer**
>
> **(a)   Establishment. -**
>
> (1)   An agency shall designate an official or employee to act as the open-records officer.
>
> . . .
>
> (b)   **Functions. -**
>
> (1)   The open-records officer shall receive requests submitted to the agency under this act, direct requests to other appropriate persons within the agency or to appropriate persons in another agency, track the agency's progress in responding to requests and issue interim and final responses under this act.

65 P.S. § 67.502.

DOC maintains that nothing in Section 502 or any other section of the RTKL places on the open records officer a duty to perform an independent record search, physically obtain records, review them or assess their content. Rather, it asserts the duty to make a good faith effort under Section 901 was placed on the agency, and notes that in this case, "Ms. Montag, who was familiar with the records, was part of the agency at the time in question." Appellant's Brief, at 17.

DOC recognizes that once it receives a request, an agency must perform an assessment whether the record requested is a public record. However, it argues that while the open records officer may perform the assessment, having someone else do so, such as Ms. Montag from the Bureau of Health Care Services, is not a violation of Section 502, which is silent on the point of who must perform the assessment. *Id.* at 18.

Appellees assert DOC has misconstrued the Commonwealth Court's decision because at no point does the opinion specifically state that the open records officer's failure to search for responsive documents is the basis for the finding of bad faith. Rather, it emphasizes that the court points to DOC's misconduct.

With respect to the request stage, which is the focus of the instant matter, Appellees point out that the testimony from the August 28, 2017 hearing supports the court's findings regarding DOC's failure to conduct a good faith search for responsive records. Filkosky testified that he understood the newspaper had not asked for results of the DOC's investigation into the Abolitionist Report. N.T. 8/28/17, at 139. However, based on his conversation with Ms. Montag, he "got the impression that other than the investigation, the only records that would exist would be inmates' medical files." *Id.* at 128. He did nothing to confirm his impression nor did he question Ms. Montag as to why the response to the Abolitionist Report would cover a request for documents from a third party. *Id.* at 135.

Appellees are correct that at no point does the Commonwealth Court specifically state the open records officer acted in bad faith, but instead concludes that DOC did so. However, as noted above, the court criticized both Filkosky's unquestioning reliance on Ms. Montag's representations that all responsive records related to the No Escape Investigation, and Filkosky's failure to obtain and review those records to document their content or assess any exemptions. *Uniontown II*, 185 A.3d at 1168. Immediately thereafter, the court recognized that "DOC did not perform its duties during the request stage in several material respects," *id.*, all of which directly related to the open records officer's deficient performance. The court subsequently noted:

> Here, DOC did not make a good faith effort to determine whether it had possession or control of responsive records upon receipt of the Request. Critically, it did not perform any search for records in response to the Request.
>
> DOC's failure to search records in its possession for responsive records during the request stage constitutes bad faith.

*Id.* at 1172 (citations omitted). Again, there is a clear identification between the failures of the open records officer and the DOC as found by the court. Accordingly, it is appropriate for us to consider the duties the court placed on the open records officer in this case to "obtain records from sources consulted during the No Escape Investigation; review all potentially responsive records; and assess the content of responsive records before withholding access." *Id.* at 1168.

It is well-settled that "[j]ust like a private corporation, any governmental agency or political subdivision, and indeed the Commonwealth itself can only act or carry out its duties through real people - its agents, servants or employees." *Moon Area School Dist. v. Garzony*, 560 A.2d 1361, 1366 (Pa. 1989). Section 901 of the RTKL places upon an agency the responsibility to "make a good faith effort to determine if the record requested

is a public record . . . and to respond as promptly as possible under the circumstances existing at the time of the request." 65 P.S. § 67.901. Section 502(b)(1) provides that the open records officer is the individual who receives the request and "track[s] the agency's progress in responding to requests." 67 P.S. § 67.502(b)(1). Here, the court apparently ascribed to DOC the failure of the open records officer to do anything other than forward the request to the Bureau of Health Care Services. Filkosky testified that he did not seek an explanation about the Abolitionist Investigation and how it related to the request; did not review the request with the Bureau of Health Care Services; did not question the narrow interpretation of the request by the Bureau; and did not take any steps to confirm whether the only records that existed other than those generated in the ongoing investigation were medical records. N.T. 8/28/17, at 134-36.

"When the General Assembly replaced the Right to Know Act in 2009 with the current RTKL, it significantly expanded public access to governmental records . . . with the goal of promoting government transparency." *Pa. State Police v. Grove*, 161 A.3d 877, 892 (Pa. 2017) (internal quotation and citation omitted). In order to advance this goal we conclude it is reasonable to impose on the open records officer a duty to act with diligence when "direct[ing] requests to other appropriate persons within the agency." 65 P.S. § 502(b)(1). This is what the Commonwealth Court did by implication when it faulted Filkosky for his slavish reliance on the Health Care Bureau's conclusion that the only responsive records related to the No Escape Investigation, and for his failure to review the allegedly investigative records to determine if they were exempt. Mindful that the open records officer is the statutorily designated individual responsible for the record gathering process, we reject DOC's contention the open records officer fulfills his or her obligation simply by relying on the representations of others without inquiring as to what

investigation was made and without reviewing the records upon which the individual responding to the request relied.

Accordingly, we conclude that the Commonwealth Court did not err when it determined that DOC acted in bad faith at the request stage, in significant part because the open records officer failed to act with diligence in response to Appellee's request.

Related to this issue, DOC argues the Commonwealth Court's construction of Section 502 raises significant administrative problems because it would require an open records officer to know every possible place records could exist, which is impossible for an agency the size of DOC. It also asserts that requiring an open records officer to obtain a copy of records that the agency maintains are exempt would result in duplication and temporary retention of thousands of documents that may never be released. Lastly, it asserts that requiring the open records officer to assess the records for responsiveness, instead of relying on the determinations of employees who are familiar with them may be impossible due to the technical knowledge required to determine if the records are responsive to the request. *Id.* at 19-20.

While cognizant of DOC's argument, in this instance we nevertheless agree with Appellees' reliance on *Com., Dep't of Envtl. Prot. v. Legere*, 50 A.3d 260, 266 (Pa. Cmwlth. 2012) where the court held, "[t]here is simply nothing in the RTKL that authorizes an agency to refuse to search for and produce documents based on the contention it would be too burdensome to do so." Such concerns must give way to the important goal of government transparency, which is the hallmark of the RTKL. *See Grove*, 161 A.3d at 892.

As recognized by amicus curiae Pennsylvania NewsMedia Association, '[a] good faith response - either to produce records or assert an exemption - cannot occur absent a good faith search, followed by collection and review of responsive records, so an agency

has actual knowledge about the contents of the relevant documents." Brief of Amicus Curiae, at 15. In light of DOC's failure to take any reasonable steps to respond to Appellee's request, its argument with respect to burdensomeness rings hollow.

II.

DOC next challenges the award of attorney fees under Section 1304 of the RTKL, 65 P.S. § 67.1304. The court observed that it had jurisdiction under the RTKL to consider an award of attorney's fees, based on Appellees' prior successful appeal before the OOR. After that appeal, the court noted that Appellees began this enforcement action in the Commonwealth Court's ancillary appellate jurisdiction under Chapter 13 of the RTKL. *Uniontown III*, 197 A.3d at 832.

In general, awards of attorney fees in RTKL proceedings are authorized by Section 1304(a), which provides:

> **§ 67.1304. Court costs and attorney fees**
>
> **(a) Reversal of agency determination.--**If a court reverses the final determination of the appeals officer or grants access to a record after a request for access was deemed denied, the court may award reasonable attorney fees and costs of litigation or an appropriate portion thereof to a requester if the court finds either of the following:
>
>> (1) the agency receiving the original request willfully or with wanton disregard deprived the requester of access to a public record subject to access or otherwise acted in bad faith under the provisions of this act; or
>>
>> (2) the exemptions, exclusions or defenses asserted by the agency in its final determination were not based on a reasonable interpretation of law.

65 P.S. § 67.1304(a).

The court noted that the term "final determination" is used in two different ways in Section 67.1304(a). The section refers to "the final determination of the appeals officer" in the text of Subsection (a) and "the agency in its final determination" in the text of Subsection (a)(2). *Id.* at 834 (quoting 65 P.S. §67.1304). The court concluded that the term "final determination" was therefore ambiguous. It framed the question as "whether attorney fees are reserved for when the Court reverses an *appeals officer's* determination, as opposed to when a receiving agency's determination is reversed." *Id.* (emphasis in original).

The court concluded that the best reading of Section 67.1304(a) is to authorize attorney fees when an agency's determination is reversed. Judge Simpson noted that a contrary interpretation would be unreasonable and yield absurd results. *Id.*; *see also* 1 Pa.C.S. § 1922(1). Construing the section to mean an appeals officer's determination "would penalize a requester for prevailing in its Chapter 11 appeal . . . because when an appeals officer recognizes a requester's access rights in the administrative proceeding, *reversing* that appeals officer's determination would be adverse to the requester." *Id.* (emphasis in original). The court continued that if the section required "reversal of an appeals officer's final determination is a prerequisite for requester's recovery under Section 1304(a), the agency accused of bad faith may preclude this remedy by electing not to appeal the final determination to a Chapter 13 Court." *Id.* As a result, "the most egregious of agency conduct, and the denials of access recognized as improper during the Chapter 11 appeal, could go unchecked." *Id.* The Commonwealth Court offered this case as an illustration of the problems such an interpretation would create.

> Consider the current case. DOC disregarded its disclosure duties during each stage of the RTKL process and did not comply with the appeals officer's final determination in Requester's favor. Because it obtained the Disclosure Order,

Requester had no interest in this Court reversing the appeals officer's final determination. However, DOC elected to not appeal, yet did not discover or disclose all responsive records until after years of litigation. Requester here advocated the public interest in a matter of public health affecting a captive population. Its recovery of fees should not turn on whether a noncompliant agency appealed to this Court.

In the context of "bad faith," if an agency denied access improperly, it is more likely that an appeals officer would decide disclosure in a requester's favor. Presuming an agency committed bad faith, and disregarded the RTKL process at each stage as DOC did here, then on appeal, a Chapter 13 Court is more likely to *affirm* an appeals officer's determination in a requester's favor than to reverse it.

*Id.* (emphasis in original).

The court also concluded that its construction was supported by cases construing the Right to Know Act, the RTKL's predecessor. Specifically, in *Parsons v. Pa. Higher Educ. Assistance Agency*, 910 A.2d 177 (Pa. Cmwlth. 2006) (en banc), *appeal denied*, 917 A.2d 316 (Pa. 2007), the Commonwealth Court held that the attorney fees provision of the [Right to Know Act] permitted an award of attorney fees "if a court reverses an agency's final determination[.]" *Parsons*, 910 A.2d at 188. Based on these considerations, the court construed "Section 1304(a)(1) of the RTKL as permitting recovery of attorney fees when the receiving agency determination is reversed, and it deprived a requester of access to records in bad faith." *Uniontown III*, 197 A.3d at 835. Therefore, the court held Appellees were entitled to reasonable attorney fees.[8]

In this case, Appellees requested fees totaling $215,190.75. *Id.* After reviewing the legal parameters surrounding what constitutes "reasonable" attorney fees, and upon consideration of the evidence presented, the Commonwealth Court reduced the amount of attorney fees to $118,458.37. *Id.* at 841.

---

[8] In light of its conclusion on Section 67.1304(a), the court declined to decide whether the Costs Act would allow Appellees to recover attorney fees. *Uniontown III*, 197 A.3d at 835; *see also generally* 42 Pa.C.S. § 2503(7).

DOC asserts that the Commonwealth Court erred in concluding that the term "final determination" in Section 1304(a) is ambiguous. It argues, "[w]hile it is true that the term is used in two places to address different determinations, each use is clear in itself." Appellant's Brief at 22. DOC notes that while Section 1304(a) provides for imposition of costs and attorney fees if the court reverses "the final determination of an appeals officer," Section 1304(a)(2) refers to the final determination of the agency in answering the request. *Id.*

DOC draws our attention to Section 1921(b) of the Statutory Construction Act, which provides that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S § 1921(b). It avers that the plain language of Section 1304(a) "limits court costs and fees imposed to two instances --- reversal of the appeals officer or grant of a deemed denial." *Id.* Here, the Commonwealth Court did not reverse the appeals officer because no appeal was taken from her order. Nor was there a deemed denial by the agency. Accordingly, DOC argues that in light of the plain language of the statute, the court should not have resorted to the principles of statutory construction.

Appellees offer several reasons in support of their position that we should affirm the Commonwealth Court's interpretation of Section 1304(a). Initially, they note that the heading of the section, "reversal of an agency decision," indicates that the provision applies any time an agency's decision to deny access is reversed. In addition, they assert the multiple references to a "final determination" in Section 1304(a), along with the heading of the section create an ambiguity that justifies the Commonwealth Court's reliance on canons of statutory construction. *See*, *Narberth Borough v. Lower Merion Twp.*, 915 A.2d 626, 634 (Pa. 2007) (statutory interpretation principles apply when "the

plain language of the statute, standing alone, leaves room for doubt as to its intended meaning.").

Appellees emphasize that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). This Court held that "the objective of the RTKL is to empower citizens by affording them access to information concerning the activities of their government." *Levy v. Senate of Pennsylvania*, 65 A.3d 361, 381 (Pa. 2013) (quotation and citation omitted). "Courts should liberally construe the RTKL to effectuate its purpose of promoting access to official government information in order to prohibit secrets, scrutinize the actions of public officials, and make public officials accountable for their actions." *Id.* Appellees' Brief at 36-37.

When interpreting a statute, we are mindful that "the General Assembly does not intend a result that is absurd." 1 Pa.C.S. § 1922(1). Echoing the Commonwealth Court, Appellees argue that limiting fees to situations where the court reverses an order of the OOR appeals officer would render such a result. "If reversal of the OOR was a prerequisite to fees, the RTKL would penalize a requestor for prevailing at the OOR." *Id.* at 37.

Appellees further assert this Court has recognized that the RTKL, which replaced the former Right to Know Act, "was a dramatic expansion of the public's access to government documents" and "demonstrate[s] a legislative purpose of expanded government transparency through public access to documents." *Levy*, 65 A.3d at 381. The Right to Know Act contained the following fee shifting provision:

> **(a) Reversal of agency determination.** If a court reverses an agency's final determination, the court may award reasonable attorney fees and costs of litigation or an appropriate portion thereof to a requester if the court finds either of the following:

>> (1)     the agency willfully or with wanton disregard deprived the requester of access to a public record subject to access under the provisions of this act; or
>
>> (2)     the exemptions, exclusions or defenses asserted by the agency in its final determination were not based on a reasonable interpretation of the law.

65 P.S. § 66.4-1(a) (repealed).

Noting that Section 1304(a) of the RTKL has the identical heading as Section 66.4-1(a) of the Act, Appellees suggest the RTKL should be read in accord with the predecessor statute. To do so is consistent with this Court's direction that when discerning legislative intent we may consider "the former law, if any, including other statutes or regulations upon the same or similar subjects." *Com. v. Giulian*, 141 A.3d 1262, 1268 (Pa. 2016). Further supporting this position, Appellees note that while the RTKL bill was before the Senate, the focus was on strengthening the enforcement provisions and facilitating fee shifting:

> Another criticism of Senate Bill No. 1 is the fact that it removes criminal penalties which have existed since the current law was adopted. This was done because we can find no evidence of a single criminal prosecution under the 1957 law, and because the ACLU and the Attorney General of Pennsylvania agree that criminal, sanctions were an inappropriate remedy. Although Senate Bill No. 1 removes the criminal penalties, it also significantly strengthens civil penalties for noncompliance and makes it easier for a plaintiff to recover attorney fees if an agency acts in bad faith. I believe these are things that will have a practical, meaningful effect on people's ability to obtain records.

SB 1, PN 1583 - Pa. Legis. J., No. 89, Sess. of 2007, *Bill on Third Consideration and Final Passage*, at 1407 (Pa. 2007) (Sen. Pileggi).

Because the intent of the Legislature when enacting the RTKL was to expand access to government records, Appellees argue it would be unreasonable to limit fee

shifting to a narrower set of circumstances than provided for in the Right to Know Act. Accordingly, consistent with its predecessor, the enforcement provision of the RTKL should apply "where an agency's final decision to deny access is reversed and found to be in bad faith." Appellees' Brief, at 40.

Appellees further challenge DOC's position that only a deemed denial as opposed to an express denial can serve as a basis for fee shifting. They note that throughout the RTKL no distinction is made between deemed and express denials. Accordingly, relying on the rule that "[e]very statute shall be construed, if possible, to give effect to all its provisions," 1 Pa.C.S. § 1921(a), Appellees argue that deemed and express denials give requestors the same rights under the RTKL. *Id.* at 40-41.

Appellees maintain the enforcement provisions of the RTKL should be viewed in a manner consistent with Section 1932(b) of the Statutory Construction Act, which provides, in relevant part, "[s]tatutes in pari materia shall be read together. 1 Pa.C.S. § 1932(b), Appellees point out that Section 1305(a) of the RTKL permits a civil penalty of up to $1,500 "if an agency denied access to a public record in bad faith." 65 P.S. § 67.1305. Because this section applies any time a bad faith denial of access occurs, Appellees assert that a similar standard should apply to the fee shifting provisions of Section 1304(a). *Id.* at 41.

Our resolution of this issue is grounded on whether Section 1304(a) is ambiguous. As this Court has noted:

> In matters involving statutory interpretation, the Statutory Construction Act directs courts to ascertain and effectuate the intent of the General Assembly. 1 Pa.C.S. § 1921(a). A statute's plain language generally provides the best indication of legislative intent. *See*, *e.g., McGrory v. Dep't of Transp.*, 591 Pa. 56, 915 A.2d 1155, 1158 (2007); *Commonwealth v. Gilmour Mfg. Co.*, 573 Pa. 143, 822 A.2d 676, 679 (2003). In construing the language, however, and giving it effect, "we

should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." *Roethlein v. Portnoff Law Assocs., Ltd.*, 623 Pa. 1, 81 A.3d 816, 822 (2013), citing *Mishoe v. Erie Ins. Co.*, 573 Pa. 267, 824 A.2d 1153, 1155 (2003). Accord *Commonwealth v. Office of Open Records*, 628 Pa. 163, 103 A.3d 1276, 1285 (2014) (statutory language must be read in context; in ascertaining legislative intent, every portion is to be read together with remaining language and construed with reference to statute as a whole).

The United States Supreme Court also takes a contextual approach in assessing the plain language of statutes and in determining if an ambiguity exists. *See generally King v. Burwell*, 576 U.S. 473, 486, 135 S.Ct. 2480, 2489, 192 L.Ed.2d 483 (2015) ("If the statutory language is plain, we must enforce it according to its terms. But oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. So when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme." (internal quotation marks and citations omitted)); *Yates v. United States*, 574 U.S. 528, 537, 135 S.Ct. 1074, 1081–82, 191 L.Ed.2d 64 (2015) ("'[T]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.' Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things." (internal citations omitted)).

*Com. v. Giulian*, 141 A.3d at 1266.

Like the Commonwealth Court, we conclude that the use of the term "final determination" with respect to the appeals officer and to the agency in the same section renders the term ambiguous in Section 1304(a).

In light of this ambiguity, recourse to statutory interpretation is appropriate. Foremost, we look to the intent of the legislature when enacting the RTKL. As this Court

has recognized, "the objective of the RTKL . . . is to empower citizens by affording them access to information concerning the activities of their government." *SWB Yankees, LLC v. Wintermantel*, 45 A.3d 1029, 1041 (Pa. 2012). "We are obliged to liberally construe the [RTKL] to effectuate its salutary purpose of promoting access to official government information in order to prohibit secrets, scrutinize actions of public officials and make officials accountable for their actions." *Dep't of Pub. Welfare v. Eiseman*, 125 A.3d 19, 29 (Pa. 2015) (quotation and citation omitted).

As noted, the fee shifting provision of the Right to Know Act provided for an award of reasonable attorney fees and cost of litigation where "a court reverses an agency's final determination." 65 P.S. § 66.4-1(a) (repealed). If we were to accept DOC's position that Section 1304 only permits recovery of attorney fees and costs where the court reverses the determination of the appeals officer or the agency deems the request denied, a requester would have less rights under the RTKL than under the repealed Right to Know Act. Considering that the RTKL "significantly expanded public access to governmental records . . . with the goal of promoting government transparency," *Grove*, 161 A.3d at 892, such a result is contrary to legislative intent.

Moreover, as the Commonwealth Court recognized, making the reversal of the appeals officer's determination a prerequisite for imposition of attorney fees and costs can lead to an absurd result. In this case, after DOC denied Appellees' request, they sought relief from the OOR appeals officer who issued a disclosure order in their favor. Having received the relief they requested, Appellees had no reason to seek further appeal. DOC chose not to appeal, yet nevertheless failed to "discover or disclose all responsive records until after years of litigation." *Uniontown III*, 197 A.3d at 834. The effect of DOC's proposed reading of Section 1304 is that a requester who is successful at the OOR is prevented from seeking attorney fees and costs if an agency does not file

an appeal. The practical effect of DOC's position is to limit a requester to "a civil penalty of not more than $1,500 if an agency denied access to a public record in bad faith." 65 P.S. § 67.1305.

Consistent with the purpose of the RTKL, we affirm the conclusion of the Commonwealth Court that Section 1304(a)(1) "permit[s] recovery of attorney fees when the receiving agency determination is reversed, and it deprived a requester of access to records in bad faith." *Id.* at 835.

Chief Justice Saylor and Justices Baer and Donohue join the opinion.

Justice Wecht files a concurring and dissenting opinion in which Justice Todd joins.

Justice Dougherty files a dissenting opinion.